THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LAWRENCE ANDREWS, Defendant-Appellant.

First District (3rd Division)   No. 1—86—635

Opinion filed July 6, 1988.—Rehearing denied July 27, 1988.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Kim A. Novi, and Marilyn Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant, Lawrence Andrews, was tried by a jury and convicted of murder, armed robbery and aggravated battery. He was sentenced to an extended term of 70 years for murder, 30 years for armed robbery and five years for aggravated battery. The sentences are to run concurrently. On appeal, defendant contends that: (1) the denial of his pretrial motion to waive a death penalty jury deprived him of an impartial jury to try the merits of the case; (2) the trial court erred in allowing a police officer to testify in rebuttal as an expert witness; (3) the trial court erred in refusing to give his tendered instruction on identification; (4) his sentence of 70 years is excessive; and (5) the

case should be remanded for a hearing pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. We remand with directions.

On February 20, 1984, at about 6 p.m., the victim, 18-year-old Richard Steinbrecher, and his 17-year-old girlfriend, Angela Atiles, were in an automobile traveling west on the Eisenhower Expressway in Chicago. Steinbrecher was driving, and Atiles was sitting in the front passenger seat. After exiting the expressway, Steinbrecher stopped the automobile at a red traffic light on Kostner, just north of the expressway. While Steinbrecher was waiting for the traffic signal to change, Atiles noticed a man standing by the curb, looking at the automobile. He was medium build and wore a black jacket quilted around the shoulders.

After Atiles first noticed the man, whom she later identified as defendant, she turned toward Steinbrecher. When she turned to look at defendant again, he had moved closer to the automobile. Atiles turned away from defendant again. Suddenly, defendant got in the front seat of the automobile, next to Atiles, and pointed a gun at Atiles and Steinbrecher. At that time, another man later identified as Rickey Paxton appeared on the other side of the automobile. Paxton wore a rust and cream-colored ski mask hat, with another hat on top. Atiles put her head on Steinbrecher's lap. Steinbrecher tried to move the gear shift of the automobile, and the automobile moved slightly. Steinbrecher then told defendant and Paxton, "All right, all right. Just be cool. We'll give you what you want." Atiles then heard a crack sound, as if defendant's gun had hit the windshield. She did not realize that the sound came from defendant's gun as he shot Steinbrecher in the right side of his head.

Atiles sat up and looked into the face of defendant, who was still sitting next to her. Defendant then hit Atiles in the left eye with his gun, and said, "Give me your money, bitch." Atiles gave defendant all the money she had, $7. Paxton repeatedly asked defendant, "How much she got?" Defendant answered, "I don't know." Then defendant and Paxton fled.

Atiles realized Steinbrecher was unconscious, and she attempted to revive him but failed. She then got out of the automobile and went to a nearby gas station where she saw someone she later identified as Frank Phillips. An ambulance arrived at the scene and Atiles and Steinbrecher were taken to a hospital. While at the hospital, Atiles was treated for a swollen and black and blue left eye; her eye ball was red. At the hospital, Atiles was told that Steinbrecher died as a result of the gunshot to his right temple.

While she was still at the hospital, and within an hour and a half of the robbery and killing, Atiles was interviewed by a police officer. According to the officer, Atiles was upset, crying and disorganized. In the interview, she told the officer that the man in the ski mask had shot Steinbrecher and hit her.

Defendant and Paxton were arrested at about 9:30 p.m. on February 20, 1984, in the kitchen of Paxton's home. Defendant was still wearing the black, partially quilted jacket that he wore when the crime was committed. The two men were taken to a police station, where defendant signed a consent form to conduct a weapons search of his home. When the police officers arrived at defendant's home, defendant's mother escorted them to a bedroom where a .22 caliber pistol was found under a mattress. The weapon was later analyzed by two firearms technicians and they found it to be the murder weapon.

On February 21, 1984, defendant gave a four-page written statement to the police, which he signed. In his statement, defendant said that he and Paxton planned to do some stickups, and rob people in their cars as they pulled up at the stoplight on Kostner by the expressway ramp. Defendant said that as a blue car pulled up and stopped, he walked to the passenger side and pulled the door open while Paxton went to the driver's side. Defendant said that he then pointed his .22 pistol at the girl in the car and asked for her money. According to defendant, as he reached over the girl to go through the man's pockets, the gun fired. Defendant and Paxton then ran away. Defendant's statement was admitted into evidence at trial, over defendant's objection. Defendant contended that the statement was coerced and not voluntary.

On February 21, 1984, Atiles went to the police station to offer more information about the incident. She provided police with a description of the perpetrators. While looking through photographs, Atiles identified Frank Phillips in a photograph as someone she had seen at the gas station in the area where she was seeking help following the shooting. Later, on February 21, Atiles viewed a lineup. At the lineup, she identified defendant as the man who had gotten into the automobile and hit her with his gun. She also identified Paxton as the second man. All the lineup participants had to put on two hats as Atiles viewed them. The two hats were taken from Paxton at the time of his arrest. Atiles also identified Frank Phillips in the lineup as the man she had recognized earlier as being in the area, but she said he was not one of the offenders.

■ Defendant first contends that the denial of his pretrial motion to waive a death penalty jury deprived him of an impartial jury to try

the merits of the case. Prior to the commencement of the *voir dire*, defendant moved to waive his right to a jury at a possible death penalty hearing. The motion was denied on the basis that it was premature, and that the motion would be timely if a verdict was returned against defendant. At the *voir dire*, the venire were asked about their opinions regarding the imposition of the death penalty pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The court asked the venire the following questions: (1) Do you have any scruples against the imposition of the death penalty in a proper case? and (2) Would your attitude towards the death penalty prevent you from making a fair and impartial decision as to the defendant's guilt or innocence? Defendant argues that the "Witherspooning" of the prospective jurors deprived him of an impartial jury.

At the time this case was tried, the prevailing appellate court decisions held that a pretrial motion to waive a death penalty jury in the event there was a guilty verdict was premature and therefore untimely. (See *People v. Wolfbrandt* (1984), 127 Ill. App. 3d 836, 844, 469 N.E.2d 305, 311-12.) Subsequently, in *Daley v. Hett* (1986), 113 Ill. 2d 75, 79-80, 495 N.E.2d 513, 516, the Illinois Supreme Court held that a trial court is empowered to accept a knowing and voluntary pretrial waiver of a possible sentencing jury. However, this ruling in *Hett* was held not to apply retroactively. (*People v. Erickson* (1987), 117 Ill. 2d 271, 291-92, 513 N.E.2d 367, 373-76; *People v. Shum* (1987), 117 Ill. 2d 317, 339, 512 N.E.2d 1183, 1189-90.) Moreover, the United States Supreme Court held that *voir dire* questions regarding the imposition of the death penalty do not create a conviction-prone jury or violate the sixth amendment of the United States Constitution. (*Lockhart v. McCree* (1986), 476 U.S. 162, 173-83, 90 L. Ed. 2d 137, 147-54, 106 S. Ct. 1758, 1764-69.) Under the circumstances presented here, we conclude that the denial of defendant's pretrial motion to waive a death penalty jury and the "Witherspooning" of prospective jurors did not deprive defendant of an impartial jury on the merits of the case.

■ We next address defendant's claim that the trial court erred in allowing police officer Donald Smith "to testify in rebuttal as an expert witness because his testimony was cumulative and improperly vouched for the credibility of officer Gunnell's testimony." We disagree.

Police officer Donald Gunnell, a firearms technician with the Chicago police department, testified for the State in its case in chief. Gunnell testified that he analyzed defendant's gun and the bullet that was removed from the decedent. Gunnell stated that in his opinion,

the bullet removed from the decedent was fired from defendant's gun.

When the State rested, defendant called Joseph Nicol, a retired criminal justice professor, as an expert witness. Nicol testified that in his opinion "there was a moderate probability the evidence bullet was fired from the gun." In rebuttal, the State called Officer Smith. He was Officer Gunnell's supervisor at the time Gunnell performed his tests to determine whether the bullet had been fired from defendant's gun. Smith testified that as Gunnell's supervisor, he performed a routine verification of Gunnell's test results. However, Smith also testified that later he performed his own tests to determine whether the bullet was fired from defendant's gun. Smith testified that in his opinion, the bullet had been fired from defendant's gun.

The admissibility of evidence on rebuttal is within the discretion of the trial court. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 538, 464 N.E.2d 659, 677.) Here, although Smith's rebuttal testimony may have verified Gunnell's opinion, it also rebutted the testimony of defendant's expert, Nicol. Also, while Smith's separate opinion may have been in accord with Gunnell's opinion, it was not merely cumulative because Smith's opinion was based on another set of test findings which he, not Gunnell, conducted. Under the circumstances, we do not believe the record reflects that the trial court abused its discretion in admitting the rebuttal testimony of Smith.

Defendant next argues that "[w]here one of the crucial issues in the case was the opportunity of the eyewitness to accurately identify the offenders, it was erroneous to refuse to give defendant's tendered instruction on identification." One of defendant's theories at trial was that Atiles had mistakenly identified defendant as the offender and that Phillips was the offender. In this regard, defendant states that Atiles told the police officer about 1½ hours after the shooting that the man with the mask had the gun, and later she told the police that the masked man was taller than the man without the mask. Phillips is shorter than Paxton. On cross-examination, when Atiles was asked whether the masked man was taller than the unmasked man, she answered, "I suppose, I don't remember."

Defendant contends that based upon the evidence, the trial court erred in refusing his tendered identification instruction, which is a modification of Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981) (hereinafter IPI Criminal 2d). Defendant's tendered instruction reads as follows:

> "The State must prove, beyond a reasonable doubt, that the crimes charged in this case were actually committed. But more than that, the State must also prove, beyond a reasonable

doubt, that the defendant committed the crimes. Therefore, the identification of the defendant by Angela Atiles as the person who shot Richard Steinbrecher and hit her with the gun is an important part of the State's case. As with any other witness, you must first decide whether Angela Atiles is telling the truth as she understands it. But you must do more than that. You must also decide how accurate the identification was, whether she saw what she thought she saw.

You should consider her testimony that she did not know the defendant before the crimes took place; whether she had a good opportunity to see the person; whether she seemed as though she was paying careful attention to what was going on; whether the description given by her was close to the way the defendant actually looked; how much time had passed between the crimes and the first identification by her; whether, at the time of the first identification by her, the conditions were such that she was likely to make a mistake, that is, whether she was asked to pick out the person she saw from a group of people; whether, at an earlier time, she failed to identify the defendant; whether, at an earlier time, she changed her mind regarding the identification; and whether she seemed certain at the time of the first identification and again when she testified here in court. If you are not convinced beyond a reasonable doubt that it was the defendant who committed the crimes, you must find him not guilty."

Instead of defendant's instruction, the trial court gave the jury IPI Criminal 2d No. 1.02, which reads as follows:

"You are the sole judges of the believability of the witnesses and of the weight to be given to the testimony of each of them.

In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, and the reasonableness of his testimony considered in the light of all the evidence in the case."

The trial court also gave the jury IPI Criminal 2d No. 2.03, which deals with the burden of proof.

In *People v. Fox* (1971), 48 Ill. 2d 239, 249, 269 N.E.2d 720, 726-27, the court held that IPI Criminal 2d No. 1.02, dealing with the credibility of witnesses, coupled with IPI Criminal 2d No. 2.03, dealing with the burden of proof, adequately addresses the issue of eyewitness identification. Moreover, whenever the IPI Criminal instructions do not contain an instruction on a subject upon which the jury

should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument. 107 Ill. 2d R. 451.

Here, defendant's instruction is not simple, brief, impartial, or free from argument. Instead, the instruction highlights one piece of evidence to the exclusion of other evidence relating to identity, including defendant's confession and expert testimony that the decedent was killed with a bullet discharged from defendant's gun. Based upon these facts, we do not believe the court erred in refusing defendant's instruction relating to identity.

■ Defendant next contends that his sentence of 70 years for murder is excessive. Following the return of a guilty verdict against defendant, a death penalty sentencing hearing was conducted. The jury found defendant eligible for the death penalty, but it could not reach unanimity that death was the appropriate punishment. The court then sentenced defendant to an extended term of 70 years for the murder. Defendant argues that the sentence is excessive "given the circumstances of the offense and his background."

The circumstances of the offense are that defendant intended to commit armed robbery and he shot the 18-year-old decedent in the side of the head at close range after the decedent offered to give defendant what he wanted. After shooting the decedent, defendant turned to the decedent's 17-year-old companion and hit her in the eye with his gun and told her, "Give me your money bitch." After receiving the money, he fled. Defendant's background reveals that he was 18 years old when the murder was committed. In 1983, he was convicted for a residential burglary and given probation. In 1984, he was convicted for the theft of a motor vehicle and sentenced to four years' imprisonment.

The trial court called the murder a "senseless, unresisted crime." The trial court also called defendant's act an "execution" which was "brutal" and "heinous and totally cruel." When we take into account the evidential conclusions of the trial court, the circumstances of the offense and defendant's background, we do not believe that the 70-year extended term was excessive.

■ Defendant's final contention is that the State used its peremptory challenges to systematically exclude blacks from the jury in violation of the equal protection clause of the United States Constitution. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) Defendant is black and the two victims are white. After 12 people were sworn as jurors, but before anything else was done, defendant objected and moved for a mistrial for the reason that

the State had used all eight of its peremptory challenges to exclude eight blacks. The trial court stated: "There are two Blacks on the jury and the State exercised eight of its peremptory challenges." Defendant's motion was denied without the State being required to give a neutral explanation for the use of all eight of its peremptory challenges on blacks.

The State initially contends that we cannot consider the issue relating to the State's unconstitutional exclusion of blacks from the jury because defendant waived this issue. To support its position, the State argues that defendant did not make his objection until after the jury was fully selected and sworn. We disagree with the State's contention.

A criminal trial is more than merely a means of meting justice. The trial is also an avenue for fulfilling the notion deeply rooted in the common law that justice must satisfy the appearance of justice. For a civilization founded upon principles of ordered liberty to continue to survive with its principles intact, its members must share the conviction that they are governed equitably. That necessity underlies the equal protection clause upon which *Batson v. Kentucky* is based. See *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 594, 65 L. Ed. 2d 973, 1001, 100 S. Ct. 2814, 2837 (Brennan, J., concurring).

Plainly, the appearance of justice is not fulfilled if the trial court acquiesces in, condones or fails to preclude attempts by the prosecuting attorney to exclude blacks from the jury solely because they are black. The trial court cannot sit idly by in such instances and become an accomplice to racial discrimination in the courtroom. Rather, it must insure that justice prevails and that the appearance of justice is demonstrated in the trial that is taking place before those in attendance. Moreover, those citizens who are selected as jurors in a criminal case are expected to judge the defendant solely on the basis of his acts and not on the basis of his race. The selected jurors can hardly be expected to accomplish this task if they see that they, themselves, were selected by the State not on the basis of their individual qualities, but as members of a particular race.

Thus, in order to maintain the appearance of justice and the integrity of our judicial process, and in order to keep itself from being an accomplice to racial discrimination, the trial court *sua sponte* must promptly and in no uncertain terms stop any racial discrimination committed in its presence. This is required whether or not the defendant makes a timely objection. We therefore find the State's waiver argument untenable. We see no difference in considering the issue in

this case than we would in considering any other plain error violation of constitutional dimension.

■■ We next consider whether there was a *prima facie* showing of racial discrimination in the State's use of its peremptory challenges so that the State should have been required to provide neutral explanations for its challenges. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708.) After *Griffith v. Kentucky* was decided, one of the Illinois cases in which the issue was raised is *People v. Hooper* (1987), 118 Ill. 2d 244, 506 N.E.2d 1305. In *Hooper*, in an exercise of its constitutionally provided supervisory authority, the supreme court entered a procedural supervisory order.[1] In entering its supervisory order in *Hooper*, the supreme court did not address whether the defendant established a *prima facie* case of racial discrimination in the State's use of its peremptory challenges. Instead, the supreme court retained jurisdiction of the case and directed the circuit court to conduct an expedited hearing on that issue. The circuit court was also directed to make appropriate findings of fact and conclusions of law and file those findings and conclusions with the clerk of the supreme court within 63 days of the entry of the supreme court's supervisory order. Since *Hooper* involves a procedural order entered by the supreme court pursuant to its supervisory authority under the Illinois Constitution, and we do not have such constitutional supervisory authority, we conclude that *Hooper* is not applicable here. We believe that *Hooper* is applicable solely to the case itself or any specific case to which the supreme court states that *Hooper* is applicable.

Here, we believe that the material facts are sufficiently demonstrated in the record so that we can decide, without prejudice to the defendant or the State, whether a *prima facie* case of racial discrimination in the State's use of its peremptory challenges exists. We have authority to make such a decision pursuant to the Illinois Constitution, article VI, section 6, and Illinois Supreme Court Rule 366(a)(4) (107 Ill. 2d R. 366(a)(4)).

The material facts are that the defendant is black and the victims are both white; the State only used eight peremptory challenges and all eight challenges were used against blacks. According to a state-

---

[1]See generally *Brokaw Hospital v. Circuit Court* (1972), 52 Ill. 2d 182, 187, 287 N.E.2d 472, 475 (appears to be the first reported case in which the supreme court exercised its supervisory authority under the Illinois Constitution of 1970, art. VI, §16).

ment by the trial court, two blacks became jurors. In our opinion the material facts are sufficient to raise a *prima facie* case of the use of peremptory challenges to exclude blacks from the jury, which will prevail until contradicted and overcome by other facts demonstrating a neutral explanation for the State's use of its eight challenges exclusively on blacks.

We believe that the seating of two blacks on the jury is a fact which the State may use, along with other facts and circumstances, to demonstrate a neutral explanation for the use of its eight challenges exclusively on blacks. However, merely because two blacks were seated on the jury is not sufficient to prevent or defeat the establishment of a *prima facie* case of racial discrimination. The affirmative racial exclusion of available black jurors by the State which results in only one or two blacks being seated on the jury is no less evil and no less constitutionally prohibited than the same procedure which results in the total exclusion of blacks. No available black person should be excluded either singularly or systematically from being a juror solely because he or she is black.

Under the circumstances, we remand this case with directions for a hearing to allow the State to come forward with a neutral explanation for the use of its eight peremptory challenges exclusively on blacks. If the State does not come forward with a neutral explanation, defendant's conviction is vacated and defendant is to receive a new trial. However, if the State presents what is determined by the trial court to be a neutral explanation sufficient to rebut defendant's *prima facie* case of racial discrimination, defendant's conviction is affirmed for the reasons stated herein. Defendant may appeal any alleged errors that may occur at this hearing in the trial court after remandment.

Remanded with directions.

WHITE, P.J., and FREEMAN, J., concur.