THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LAWRENCE A. WHALEY, Defendant-Appellant.

First District (3rd Division)   No. 1—87—2617

Opinion filed May 24, 1989.

RIZZI, J., specially concurring.

Randolph N. Stone, Public Defender, of Chicago (Alvin A. Stokes and James Reddy, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago

(Inge Fryklund and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Lawrence A. Whaley, was convicted of aggravated criminal sexual assault, home invasion and residential burglary after a jury trial in the circuit court of Cook County. The trial court sentenced defendant to 12 years' imprisonment. He appeals.

At trial, complainant testified that she was watching television in her apartment on December 21, 1986, when there was a knock at her door. When she unlocked the door, defendant, her next door neighbor's boyfriend, asked if he could borrow a cup of flour. At the time, defendant was wearing a gray shirt and pants, work boots and a rawhide coat. After complainant gave defendant the flour, she locked the door behind him. Complainant noticed that defendant smelled of body and liquor odors. She also noticed that when defendant left, he walked in the direction opposite his girlfriend's apartment. When complainant turned off the lights to watch defendant, she observed him watching her. Eventually, complainant heard defendant knock on the door of his girlfriend's apartment and say, "Yes, it's me."

Complainant then turned the lights back on and resumed watching television. Later, there was a second knock at her door. When complainant opened the door, defendant returned her cup, thanked her and left. Approximately five minutes later, there was a third knock on complainant's door. She turned the light on and answered the door. When complainant opened the door, defendant, who was wearing the same clothes as before with the addition of a brown ski mask, put his left hand over complainant's mouth and his right hand behind her head. Complainant noticed that defendant had flour on his pants and the same body and liquor odors she had noticed before. Defendant then pushed complainant into her living room and knocked her to the floor. At that time, complainant noticed that defendant had a knife in his hand. Defendant told complainant, "Don't worry, I'm not going to kill you. All I want you to do is suck me."

Defendant then pulled complainant up from the floor by her hair into her kitchen and locked the door. Complainant slid down on the floor in a corner, and defendant dropped his pants and said, "All I want you to do is suck me." After complainant pleaded for her life, defendant pulled his pants up and took complainant into the bedroom, where he lay on the bed with complainant at his side. Defendant then pulled complainant down and forced her to perform fellatio upon him

for approximately 15 minutes. During this time, complainant was able to see defendant's eyes and mouth through the mask. Also during this time, defendant laid the knife down and put his hands behind his head. Complainant then grabbed the knife and stabbed defendant in the abdominal area.

After she stabbed defendant, complainant ran for the door but defendant grabbed her from behind and started choking her. Defendant then told complainant, "I'm not going to stab you. Why did you have to stab me? I told you I wasn't going to kill you. Now I have to kill you." Defendant then stopped choking complainant, and she pleaded for her life and asked defendant to leave her apartment. Defendant asked for the knife and a towel, complainant told him again to leave, and defendant said he would not leave until he got the towel. After complainant gave defendant a towel, he put it on his pants and wiped up the blood. He also told complainant to get the knife. When defendant told complainant to wipe up the blood, she told him that she would do so and asked defendant to leave her house. Defendant responded that he would wipe up the blood because if he did not, he would be arrested and would have to kill complainant. Complainant poured Sparkle on the floor after defendant asked her if she had any Spic & Span. Defendant then wiped up the blood and told complainant to get the knife because he did not want to leave any evidence behind.

Complainant retrieved the knife from the bedroom and noted that the blade, which was about two inches long, was bent at a 90-degree angle. Defendant told complainant that he would not leave until he received $20 for stitches and the knife from complainant. Complainant took $20 from her purse and placed the money on her stove. Defendant then grabbed the money. When defendant stepped out of complainant's front door, she threw the knife onto the driveway next to her apartment, per his instructions. After watching defendant pick the knife up, complainant called her brother and the police. When the police arrived, she told them she had been raped by her next door neighbor's boyfriend.

Upon responding to complainant's call, the police found a pile of flour approximately 13 feet from complainant's door. They also found dry stains on complainant's kitchen floor of a reddish brown color that appeared to have been wiped or smeared with a liquid. Finally, complainant picked defendant's photo out of a photo array on the night of the offense and identified him out of a lineup after he turned himself into the police on December 22.

OPINION

■ On appeal, defendant contends that the lack of evidence of stab wounds on his person the day after the offense and of any blood samples linking him to the crime raised a reasonable doubt of guilt.

The day after the offense, Dr. Harry C. Swanstrom examined defendant at the request of the police for any evidence of stab wounds or cuts. The doctor examined defendant's extremities, hands, chest, trunk, and groin area. The doctor found a few superficial abrasions on defendant's hands which were already healing and which, in his opinion, could not have been inflicted less than 24 hours before the examination. Dr. Swanstrom found no other evidence of stab wounds or cuts to defendant nor did defendant appear to have lost a substantial amount of blood. On cross-examination, Dr. Swanstrom admitted that the type of cuts on defendant's hands, which the prosecutor characterized as "paper cuts," tended to bleed profusely for a short time and heal quickly. The doctor also admitted that he did not examine defendant's inner thigh behind the scrotum and that he could have had a cut beneath his pubic hair. Finally, Dr. Swanstrom admitted that he had no way of knowing to what extent a particular wound would bleed without seeing it at the time of injury.

We do not agree that the doctor's testimony alone or coupled with the failure to introduce blood samples, from the scene of the crime, raised a reasonable doubt of guilt. Complainant positively identified defendant as her attacker. She had ample opportunity to observe defendant before the attack. Despite the fact that he wore a ski mask, complainant had ample opportunity to observe her attacker during and after the attack and, thus, to identify defendant as her attacker. As defendant concedes, the testimony of a single witness who had ample opportunity to observe is sufficient to support a conviction. (*People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866.) Moreover, the determination of guilt or innocence, *i.e.*, the determination whether the State has proven guilt beyond a reasonable doubt, is, in the first instance, for the jury, and its determination will be disturbed only if an examination of the evidence leaves a serious and well-founded doubt of guilt. See *People v. Sledge* (1962), 25 Ill. 2d 403, 407, 185 N.E.2d 262.

Complainant positively identified defendant after having ample opportunity to observe him before, during and after the attack. There were other circumstances corroborating defendant's guilt as the perpetrator in this case which we will not recount here. As such, the doctor's failure to find stab wounds or cuts on defendant's body, especially in view of his admission that he did not examine the area

beneath the scrotum or pubic hair, does not leave us with an abiding doubt of defendant's guilt. Finally, we will not substitute our judgment for the jury's by concluding that blood samples from the victim's apartment connecting defendant to the crime were necessary to convict him of the offenses at issue.

Defendant also contends that he established a *prima facie* case of discrimination in the State's use of peremptory challenges to exclude two black venirepersons from the jury and that the trial court erred in not requiring the State to articulate race-neutral reasons for its actions. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) The State asserts that defendant waived the issue by, *inter alia*, failing to adequately object at trial.

■ Under *Batson*, to establish a *prima facie* case of a discriminatory use of peremptory challenges by the State, a defendant must show that he is a member of a cognizable racial group and that the State used peremptory challenges to remove members of his race from the jury panel. The defendant must show that these facts and any other relevant circumstances raise an inference of discrimination in the use of peremptory challenges. Where a defendant makes a *prima facie* showing, the State must provide a neutral explanation for its use of peremptory challenges. (*Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1722-23.) Moreover, the initial determination whether a *prima facie* case of discrimination is established is for the trial court, it being in a superior position to a court of review to make that determination. *People v. Evans* (1988), 125 Ill. 2d 50, 66-67, 530 N.E.2d 1360.

■ Two things are abundantly clear from the colloquies between the trial court, defense counsel and the prosecutor during the *voir dire* after the State exercised peremptory challenges against venirepersons Irving and Ray, which we set out in an appendix hereto. First, contrary to the State's waiver argument, defendant adequately objected to the exercise of peremptory challenges against Irving and Ray. In this regard, we do not believe that defense counsel is required to use any particular or *pro forma* language to bring a *Batson* claim to a trial court's attention. The fact that the trial court is made aware of the claim, not the manner in which the claim is made, is dispositive. Any other result would exalt form over substance. Secondly, as the Appellate Court, Second District, recently held in remanding a case for a full *Batson* hearing:

"It is clear from the record that the trial court was not entirely familiar with *Batson* and did not proceed in a manner consistent with the dictates of that case. The court did not first decide

whether the facts established, *prima facie*, purposeful discrimination. \*\*\* Consequently, the record \*\*\* is insufficient to provide us with an adequate basis to review the *Batson* issue. Furthermore, because the trial court was unfamiliar with the standards set forth in *Batson*, it did not properly inject its own observations and judicial experience into the determination of whether the assistant State's Attorney used the peremptory challenge \*\*\* in a discriminatory fashion." *People v. Jones* (1988), 177 Ill. App. 3d 663, 667, 532 N.E.2d 543.

Therefore, like the *Jones* court, we remand this case with directions that defendant be allowed to present evidence pursuant to *Batson* that the State engaged in purposeful racial discrimination in exercising its peremptory challenges against venirepersons Irving and Ray. In that hearing, the court must expressly determine whether defendant has made a *prima facie* showing of purposeful discrimination. If he does, the trial court must then determine whether any explanations offered by the State are racially neutral. If the court determines that they are, the judgment and sentence against defendant are affirmed. If not, the judgment and sentence are vacated and a new trial is ordered. See *People v. McNeal* (1987), 160 Ill. App. 3d 796, 806, 513 N.E.2d 897.

■ Finally, we reject the State's contention that defendant waived the *Batson* issue by also failing to raise it in his written post-trial motion. The State cites *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), ____ U.S. ____, 102 L. Ed. 2d 263, 109 S. Ct. 274, and *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, in support of its waiver argument.

In *Enoch*, the supreme court reaffirmed the rules that "[b]*oth* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial" and that the failure to specify grounds for a new trial in a written motion therefor constitutes waiver of the issue on review in the absence of plain error. (Emphasis in original.) *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 187, 522 N.E.2d 1124, *cert. denied* (1988), ____ U.S. ____, 102 L. Ed. 2d 263, 109 S. Ct. 274.

In *Evans*, the supreme court held that the defendant had waived any right to assert error in the exclusion of a black venireperson from the jury, stating:

"*Batson* requires that the defendant make a timely objection to the prosecutor's peremptory challenge. [Citation.] The peremptory challenge of Mary Patton was never objected to by the defense, either at trial or in post-trial motions. We do not believe

that an objection occurring after the jury is sworn can be deemed timely. Therefore, as the defense has objected to the challenge against Mary Patton for the first time on appeal, that particular objection has been waived." *People v. Evans* (1988), 125 Ill. 2d 50, 61-62, 530 N.E.2d 1360.

We cannot agree with the State that, even in light of *Enoch*, *Evans* must be construed as requiring a defendant to raise a *Batson* claim both before the jury is sworn *and* in a written post-trial motion to preserve it for appeal.

In so concluding, we note that, unlike defendant here, the *Evans* defendant objected neither at trial *nor* in his post-trial motion to the State's peremptory challenges. We also note the supreme court's recognition in *Evans* that *Batson* requires only a "timely objection" to the State's use of peremptory challenges. Finally, we note the court's observation in *Evans* that "[w]e do not believe that an objection occurring *after* the jury is sworn can be deemed timely." (Emphasis added.) *Evans*, 125 Ill. 2d at 61-62.

In view of the facts of *Evans* and the language of the supreme court therein, we believe that it can reasonably be construed as requiring only a timely objection during the *voir dire* to preserve a *Batson* claim for appeal. We have already found that defendant adequately brought the *Batson* issue to the trial court's attention. We now hold that, having done so during the *voir dire*, he made the timely objection required by *Batson* and *Evans*. Manifestly, defendant preserved the issue for appeal.

Finally, a word or two about the special concurrence of our colleague, Justice Rizzi. Preliminarily, we nowhere conclude or reason in this opinion that "the issue of the State excluding blacks from the jury solely because of their race is waived simply because no objection is made during the *voir dire*." (See 184 Ill. App. 3d at 471.) More importantly, while we would like to agree with Justice Rizzi that this court's opinion in *People v. Andrews* (1988), 172 Ill. App. 3d 394, 526 N.E.2d 628, *appeal allowed* (1988), 123 Ill. 2d 560, controls the disposition of defendant's *Batson* claim, we do not see how we, as a subordinate court of review, may ignore our supreme court's holding in *Evans* that *Batson* requires a defendant to make a timely objection to the State's use of peremptory challenges. We recognize that *Andrews* is, at this point in time, still good law. However, we believe that *Evans* casts sufficient doubt upon *Andrews* that it is best to avoid any infirmity in the instant judgment of this court by relying on that case. The facts of this case reveal a principled manner in which we may do so, *i.e.*, the sufficiency of defendant's objection to the State's use of

its peremptory challenges.

For all of the foregoing reasons, the cause is remanded to the trial court with instructions.

Remanded with instructions.

WHITE, J., concurs.

## APPENDIX

(Mr. Rodney Irving)

"MR. O'TOOLE [Defense Counsel]: Judge, I would ask pursuant to [*Batson*] that the State decided to knock off Mr. Irving who is a black male individual.

MR. McGARR [Assistant State's Attorney]: Judge, it's my understanding that [*Batson*] addresses a systematic and recognizable exclusion of a cognizable race, the same as the defendant's cognizable race. I have exercised two preemptory [*sic*] challenges from a panel of four. For the record one was a white male and one was a black male. I don't see where Mr. O'Toole has even approached a prima facie case of systematic and deliberate exclusion. Judge, I think that it is completely premature for Mr. O'Toole to even raise a [*Batson*] issue at this moment because nowhere has the State even approached a systematic and deliberate exclusion. There is an exclusion of one white and one black. That is inconsistent with a [*Batson*] argument at this point. For the record, Judge, I have excused one white. If there is systematic exclusion it is against whites as much as blacks.

THE COURT: This is a very serious issue that the Courts are confronted with now and it should not come down to a situation where every time a black is challenged that the issue is raised, and yet if I were a defense counsel I daresay I would raise the question. I think you have to.

MR. McGARR: But, your Honor, do you find a prima facie case?

THE COURT: No one had read it more than I have.

MR. McGARR: That's correct, Judge, and I have read [*Batson*] and I have studied some memorandum that has been written by the appellate division of our office and, Judge, one excusal does not make a systematic exclusion.

THE COURT: No, I think for the record, when a black is excluded there should be sidebar and I think the State should give some reasons in the event that the question should arise. Two, three years from now and there is no record of it. We have to start right at the

beginning in order to make a record. You have to start right from the first person on. I have the issue presented before me now from the Appellate Court. It was sent back for a hearing. They have to pass upon it this week. Thank goodness there was a complete record in the jury selection where there were reasons that were given, I believe, and I think to protect everything, if you have a reason, I think you should give it. I mean, that's outside the presence of the jury.

MR. McGARR: Judge, are you requiring me to state—

THE COURT: I'm not requiring. I just think if you could, I think it would be helpful to some Judge in the future, in the event there's a judgment pending and it goes up and comes back. If you want to, you can. You don't have to.

MR. McGARR: Judge, I'm not trying to disregard. I just think it's up. to them to raise the objection because I have excused one black. I have thrown off more white jurors then [sic] I have black, of record.

MR. O'TOOLE: Judge, if Mr. McGarr wants to make a prima facie case, I would just say that Mr. Irving, who happened to be a black male who was a computer supervisor. He has been employed nine years. We didn't even get a chance to see the card. We haven't seen the card yet, but he has been employed nine years as a supervisor, as you stated at a big Chicago bank. He subscribes to Field and Stream magazine. Mr. Irving stated he would be a fair juror. He stated that he had no religious convictions that would prevent him from finding the defendant guilty. I see nothing in the record that would make Mr. Irving any different than any of the other jurors that we have accepted so far. Judge, for the record he has also been a victim of an armed robbery.

MR. McGARR: For the record, we asked him on the record if being a victim of an armed robbery and the person not being caught would in any way influence him. We also asked the question, if nobody was caught, would you want to even the score and convict Mr. Whaley?

THE COURT: Well, you have been put on the record.

MR. McGARR: Judge, for the record, and I want to go back on the record—For the record, there is one excusal, one preemptory [sic] excusal by the State of a cognizable racial group that the defendant belongs to. I'd like the record to reflect that the victim is a female black in this case.

MR. O'TOOLE: Judge, I would just like to state that the defendant in this occurrence, again, I found, you know, that there is no reason why that person is being excluded.

\*\*\*

A VOICE: I have to attend a funeral tomorrow.

THE COURT: You are excused. Get your ticket. Sir, did you come in late?

A VOICE: Yes, I had to go to the washroom.

THE COURT: You weren't present when the jury was sworn.

\* \* \*

THE COURT: The defendant's name is Lawrence Whaley. Do you know either the State's Attorney or defense lawyers?

A VOICE: No.

MR. McGARR: I would ask for another sidebar.

\* \* \*

MR. McGARR: Judge, for the record, we are now at a sidebar outside the presence of the jury. Your Honor, the reason I asked for a sidebar is I want to make the record replete with the fact that on my pre-trial excusal of one white as well as one black man an objection was raised by Mr. O'Toole that I considered premature and with all due respect to your Honor, Judge, I think you should have summarily denied it.

Secondly, Judge, the panel, the two prospective jurors that I have accepted of the panel, of which I excused two, which I accepted two of them, one was a black man who now has indicated to you because of family obligations he cannot serve as a juror in this case. I would like the record to reflect that is someone whom I accepted.

MR. O'TOOLE: Judge, I would object. He did not accept him yet, Judge. He has not accepted that panel.

MR. McGARR: I tendered it. I tendered that panel to you, and there is—one of the jurors I was going to keep on that panel is a black man whom the Court has just excused for cause.

MR. O'TOOLE: Judge, I would like the record to reflect that what [Mr. McGarr] might have been thinking has no place on the record because that panel was not tendered to me yet. That panel has not been accepted yet and in order for a panel to be accepted, it has to be accepted by myself and Mr. McGarr.

THE COURT: The only point involved was that the man had to go to a funeral. I wrote in my notes he was a black juror. That's all we need. Step out here, please."

(Ms. Janice Ray)

"MR. O'TOOLE: Your Honor, I would like the record to reflect that Janice Ray has four children, she is a black female and she has been employed for the last ten years and she was excluded by the State and I do not believe her qualifications to serve as a juror were

any different than any of the other people in the panel.

THE COURT: Does the State hear that?

MR. McGARR: Yes, Judge.

THE COURT: I don't think that the Supreme Court ruling of the United States even implied that there shall be no exclusion of any person who is black. Now, the case didn't hold that.

MR. O'TOOLE: Judge, I understand that. I am just trying to show for the record, your Honor, her answers to the questions that were posed to her—she said that she could be a fair juror. She stated she had no problem with the State proving their case beyond a reasonable doubt, a finding of a guilty verdict. She stated that she would have no problem in keeping an open mind as far as the defendant, Mr. Whaley, not testifying. And, your Honor she stated that she is the mother of four children. Two boys. She might have three children.

THE COURT: She's got three children, 21, 22, and 23. How old is your defendant?

MR. O'TOOLE: Mr. Whaley is 29 years old. Nothing that she stated, your Honor, I felt would discredit her as a juror.

THE COURT: Suppose a lawyer had a hunch. Maybe because she has young boys out of work she might be sympathetic. There might be all kinds of reasons. I don't think the fact that they make a preemptory [sic] challenge creates a Batson versus Kentucky in every instance.

MR. McGARR: Judge, for the record, there has been no finding by this Court that the prosecution has deliberately excluded black people from this jury and since there has been no finding it is not incumbent upon me to give any articulable reasons under the Batson decision. It's his burden to establish the prima facie case of that exclusion. He has failed to do so.

THE COURT: Everybody's remarks, including the Court's has [sic] been entered for the record."

JUSTICE RIZZI, specially concurring:

I concur in the result reached by the majority, but I disagree with the conclusion and reasoning of the majority that the issue of the State excluding blacks from the jury solely because of their race is waived simply because no objection is made during the *voir dire*. I believe that the *Batson* waiver issue in this case should be decided on the same basis that it was decided in *People v. Andrews*, which is presently pending before the Illinois Supreme Court (*People v. Andrews* (1988), 172 Ill. App. 3d 394, 526 N.E.2d 628, *appeal allowed* (1988), 123 Ill. 2d 560).

In *Andrews* we stated:

"A criminal trial is more than merely a means of meting justice. The trial is also an avenue for fulfilling the notion deeply rooted in the common law that justice must satisfy the appearance of justice. For a civilization founded upon principles of ordered liberty to continue to survive with its principles intact, its members must share the conviction that they are governed equitably. That necessity underlies the Equal Protection Clause upon which *Batson v. Kentucky* is based. See *Richmond Newspapers, Inc. v. Virginia* (1980), 448 U.S. 555, 594, 65 L. Ed. 2d 973, 1001, 100 S. Ct. 2814, 2837 (Brennan, J., concurring).

Plainly, the appearance of justice is not fulfilled if the trial court acquiesces in, condones or fails to preclude attempts by the prosecuting attorney to exclude blacks from the jury solely because they are black. The trial court cannot sit idly by in such instances and become an accomplice to racial discrimination in the courtroom. Rather, it must insure that justice prevails and that the appearance of justice is demonstrated in the trial that is taking place before those in attendance. Moreover, those citizens who are selected as jurors in a criminal case are expected to judge the defendant solely on the basis of his acts and not on the basis of his race. The selected jurors can hardly be expected to accomplish this task if they see that they, themselves, were selected by the State not on the basis of their individual qualities, but as members of a particular race.

Thus, in order to maintain the appearance of justice and the integrity of our judicial process, and in order to keep itself from being an accomplice to racial discrimination, the trial court *sua sponte* must promptly and in no uncertain terms stop any racial discrimination committed in its presence. This is required whether or not the defendant makes a timely objection. We therefore find the State's waiver argument untenable. We see no difference in considering the issue in this case than we would in considering any other plain error violation of constitutional dimension." 172 Ill. App. 3d at 402-03, 526 N.E.2d at 634.

The underpinning of the *Andrews* holding is the recognition that while it is the prosecutor or the attorney for the defendant who exercises peremptory challenges, it is the trial judge, acting in a judicial capacity, who actually excuses the prospective jurors. (*Cf. Edmonson v. Leesville Concrete Co.* (5th Cir. 1988), 860 F.2d 1308, *reh'g granted* January 23, 1989, (holding that race-based peremptory chal-

lenges are now banned from Federal civil cases).) Since the trial judge is so intimately involved in the process of excluding prospective jurors when peremptory challenges are exercised, it is judicially irresponsible for a judge not to stop any racial discrimination which is attempted through the use of peremptory challenges. (See generally *People v. Payne* (1982), 106 Ill. App. 3d. 1034, 1038-40, *rev'd* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202 (for a discussion of the role of the court itself when racial discrimination occurs in the courtroom).) Irresponsible judicial conduct in the trial of cases must be halted in no uncertain terms, not overlooked or condoned by resort to waiver arguments. Thus, I believe that if there was racial discrimination used in the selection of the jury in this case, *the error of the trial judge* in not *sua sponte* stopping the racial discrimination should be reviewed whether or not the defendant objected during the *voir dire* or raised the error in his post-trial motion.

Accordingly, I do not agree with the conclusion and reasoning of the majority that the issue of the State excluding blacks from the jury solely because of their race is waived simply because no objection is made during the *voir dire*. The majority's conclusion and reasoning that the issue must be brought "to the trial court's attention" (184 Ill. App. 3d at 465) to preserve the error for review is skewed because it must be presumed that the trial judge is paying attention to what is going on in his courtroom, and it is his duty to *sua sponte* stop racial discrimination committed in his presence.

## ADDENDUM

After my specially concurring opinion was circulated to my colleagues, the majority opinion was redrafted to respond to my specially concurring opinion. In its response, the majority states: "Preliminarily, we nowhere conclude or reason in this opinion that 'the issue of the State excluding blacks from the jury solely because of their race is waived simply because no objection is made during the *voir dire*.'" (184 Ill. App. 3d at 465.) I disagree with the majority's interpretation of its own opinion. In my judgment, the majority opinion plainly stands and will be cited for the proposition that the issue of the State excluding blacks from the jury solely because of their race is waived if no objection is made during the *voir dire*. The statements to support its conclusion leaves no room for doubt. The majority states: "We also note the supreme court's recognition in *Evans* that *Batson* requires only a 'timely objection' to the State's use of peremptory challenges. Finally, we note the court's observation in *Evans* that '[w]e do not believe that an objection occurring af-

*ter* the jury is sworn can be deemed timely.' (Emphasis added.) [(*Evans*, 125 Ill. 2d at 61-62.)] In view of the facts of *Evans* and the language of the supreme court therein, we believe that it can reasonably be construed as requiring only a timely objection during the *voir dire* to preserve a *Batson* claim for appeal." (184 Ill. App. 3d at 465.) Thus, what the majority says in response to my special concurring opinion is irreconcilable with what the majority says in the text of its opinion.

In addition, the majority states: "More importantly, while we would like to agree with Justice Rizzi that this court's opinion in *People v. Andrews* (1988), 172 Ill. App. 3d 394, 526 N.E.2d 628, *appeal allowed* (1988), 123 Ill. 2d 560, controls the disposition of defendant's *Batson* claim, we do not see how we, as a subordinate court of review, may ignore our supreme court's holding in *Evans* that *Batson* requires a defendant to make a timely objection to the State's use of peremptory challenges." (184 Ill. App. 3d at 465.) I believe that by relying upon and attempting to distinguish *Evans* in alternative breaths, the majority belies credibility. Moreover, contrary to what the majority says, if the majority would like to agree that this court's opinion in *Andrews* controls the disposition of defendant's *Batson* claim, it can and should do so.

I do not believe that either *Evans* or *Enoch* addressed or even tangentially discussed the conclusion or *ratio decidendi* in *Andrews*, to wit: "Thus, in order to maintain the appearance of justice and the integrity of our judicial process, and in order to keep itself from being an accomplice to racial discrimination, the trial court *sua sponte* must promptly and in no uncertain terms stop any racial discrimination committed in its presence. This is required whether or not the defendant makes a timely objection." (*Andrews*, 172 Ill. App. 3d at 402-03, 526 N.E.2d at 634.) For this reason, I do not find either *Evans* or *Enoch* applicable.

The difference that I have with the majority in this case presents a very important question to our trial judges. If the majority is correct, in effect, a trial judge may sit back and watch racial discrimination occur in his presence without committing error so long as no objection is raised by the parties; on review the inaction of the trial judge will be condoned by resorting to the doctrine of waiver because no objection was made. In my opinion, such a result is a clear example of compounded egregiousness. Moreover, I believe that the question of the role of the trial court itself when it reasonably appears that peremptory challenges are being used to effect racial discrimination must be faced candidly and squarely by reviewing courts. Up un-

til now, except for what is stated in *Andrews* and the appellate court opinion in *Payne*, the silence by reviewing courts in Illinois has been deafening.

I believe that in our type of government there are certain acts to which a trial judge can never be a participant in any way whatsoever. I do not pretend to be able to delineate all of those acts. However, I do know without reservation that one of those acts is racial discrimination in the courtroom. I also believe that when a trial judge allows the exclusion of people from participating as jurors solely because of their race, the trial judge's complicity in the acts resulting in exclusion of the potential jurors makes him an accomplice to racial discrimination in the courtroom. Thus, the trial judge's error transcends any consideration of waiver by any party. It follows that the doctrine of waiver has no place when the alleged error relates to whether potential jurors were excluded from jury service solely because of their race.

In my opinion, for the reasons stated herein, a trial judge has an affirmative duty in any kind of case to *sua sponte* stop any racial discrimination committed in his courtroom. The parties to the suit can neither accede to nor waive such a transgression. In the present case, if there was racial discrimination used in the selection of the jury, the trial judge had an affirmative duty to *sua sponte* stop the racial discrimination, and if he did not, the trial judge's error should be noticed and reviewed whether or not the defendant objected during the *voir dire*. To even consider the doctrine of waiver under such circumstances erodes the legal as well as the moral value of our righteous outrage when instances of racial discrimination occur in our courtrooms.

Accordingly, I agree with the result reached by the majority but only on the basis stated herein.