THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH HARVEY, Defendant-Appellant.

First District (6th Division)   No. 1—88—1547

Opinion filed February 8, 1991.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago. (Renee Goldfarb, David R. Butzen, and Howard D. Weisman, Assistant State's Attorneys of counsel), for the People.

JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant, Joseph Harvey, was found guilty of murder and sentenced to an extended term of 65 years, and three years' concurrent imprisonment for concealment of a homicidal death. Defendant alleges the following errors on appeal: the trial court gave erroneous instructions concerning the State's burden of proof; insufficient evidence existed to constitute probable cause for arrest; improper evidence was admitted concerning the police investigation of defendant's companion and certain testimony of a forensic scientist; the imposition of an extended sentence was unwarranted and excessive; and the State improperly used a peremptory challenge to exclude a potential alternate juror.

The pertinent facts are as follows. On August 15, 1986, at approximately 8 p.m., the deceased drove to the Arlington Height's residence of her friend, Lynn Monson. The two women then drove the deceased's red Mustang to a bar in Palatine. Later that evening, defendant and Sargon Schlemon, a co-worker at Rand Raceway (a go-cart and waterslide establishment), drove their own motorcycles to the bar.

Schlemon testified that after arriving at the bar, he became acquainted with the deceased, and that shortly thereafter, they went to the parking lot and used some of the deceased's cocaine. While in the parking lot, Schlemon and the deceased were talking and kissing. Schlemon and the deceased later went back to the bar to find defendant and Monson. At approximately 2 a.m., the group decided to leave and drove to the Rand Raceway. The deceased and

Monson drove in the Mustang, while defendant and Schlemon followed on their motorcycles.

Schlemon further testified that upon arriving at the raceway, the group sat in a picnic table area and again used cocaine. Schlemon and the deceased drifted around the grounds and continued hugging and kissing. Monson testified that defendant gave her his home telephone number so that she could call him.

Schlemon and the deceased decided that it was getting late and that it was time to leave, but first exchanged telephone numbers. Schlemon testified that he left alone on his motorcycle and that he arrived home at about 5 a.m.

Monson testified that after Schlemon left, she and the deceased went to her house to pick up beer, while defendant followed on his motorcycle. Monson, defendant, and the deceased then drove to a neighborhood park, where they drank the beer. Monson further testified that she asked the deceased to drive her home, and that defendant and the deceased discussed going to breakfast after dropping off Monson.

Mei Wang, owner of the Pines Motel in Arlington Heights, testified that at approximately 8 a.m. on the morning of August 16, defendant rang the service bell and requested a room. Defendant indicated that he would need the room for only a few hours. After completing the registration card, which included defendant's name, address, car license and make of car, Mei Wang assigned him to Room 10. Minutes later, Mei Wang saw defendant drive into the parking lot on his motorcycle, followed by the deceased driving her red Mustang. Mei Wang further testified that the deceased smiled at Wang and entered Room 10 with defendant. On the registration card defendant indicated that he drove a Pontiac automobile; however, Wang saw him enter on a motorcycle. Shortly thereafter, Mei Wang recorded the license plates of both defendant's motorcycle and the deceased's Mustang.

Mei Wang also testified that defendant knocked on her door at 4 p.m. and asked her about check-out time. Mei Wang informed him that it was 7 p.m., and she then left the motel for an hour. Upon her return, she noticed that both defendant's motorcycle and the deceased's Mustang were gone. She later cleaned the room and found that the floral bedspread, sheets and blanket were missing. She noted that the linens were missing on defendant's registration card.

Mary Reese testified that on August 16 she and her boyfriend rented a room at the Pines Motel. After arriving at the motel

around noon, they were assigned to Room 9. At approximately 1 p.m., she heard a woman screaming and a man yelling. In addition to the voices, Reese testified that she heard banging and thrashing against the wall, and that this noise continued for approximately one-half hour. Reese and her boyfriend left Room 9 at around 4 p.m., and as she pulled out of the parking lot she noticed a red car near the door of Room 10 with its trunk open.

On August 17, 1986, at approximately 3 p.m., evidence technicians from the Arlington Heights police department were called to a dead-end street in Arlington Heights where the deceased's car was found. The evidence technicians found a pile of bed linens inside the car, including a floral bedspread and sheets which appeared to be bloodstained. The deceased's body was subsequently discovered locked in the trunk, wrapped in a yellow blanket.

Dr. Robert Stein, who performed an autopsy on the deceased, documented the cause of death as manual strangulation. There were extensive marked hemorrhaging and fractures near the deceased's Adam's apple and windpipe. Dr. Stein opined that these particular bones broke upon the use of extensive force, and concluded that the deceased's death reasonably could have resulted from an extreme amount of force delivered to her throat by a fist. The deceased's injuries included lacerations to the eyes, contusions to the nose, lips, neck and shoulder, abrasions over the upper right and left arms, and lacerations to the lips.

Detective Stachnik of the Arlington Heights police department testified that he interviewed Monson, who related that defendant was the last person seen with the deceased after leaving the park. Monson provided Stachnik with defendant's telephone number, which was registered to his brother at 2037 Oxford Court in Schaumburg.

Stachnik also responded to a call requesting that he go to the Pines Motel. Mei Wang described the physical appearance of the defendant and the deceased and also provided the detectives with the registration cards from Room 10 listing defendant's home address in Schaumburg. The police showed Mei Wang two photographs of the bed linens, which she identified as the missing linens, from Room 10.

Upon leaving the motel, Stachnik and his partner drove to 2037 Oxford Court in Schaumburg, arriving at 1 a.m. Defendant's brother told the police that defendant lived with his girl friend Robyn Alhquist, in Arlington Heights and provided the police with her telephone number and defendant's photograph.

A team of officers arrived at Alhquist's apartment at 2 a.m. and found defendant's motorcycle in the parking lot. Alhquist allowed the police to enter and search the apartment. Defendant was found dressed in shorts on a back stairwell. Stachnik noted that defendant was extremely muscular and that there were severe cuts and lacerations as well as swelling in the front of his hands. In addition, Stachnik observed a stitched laceration on the back side of defendant's left hand.

While searching Alhquist's apartment, the police also found an emergency room outpatient form on the bathroom floor. The form indicated that the patient's name was Joe Brown and listed an address slightly different from Alhquist's address. The treatment date and time were listed as August 16 at 5:31 p.m. Dr. Lawrence Cohen testified that defendant entered the emergency room at the Buffalo Grove Treatment Center, stating that his name was Brown, and that he had been in a fight. Dr. Cohen stated that defendant had a laceration near a half-moon shaped callous at the base of his left middle finger, and that there were other lacerations and cuts on his hands.

While in Alhquist's apartment, Stachnik read defendant his *Miranda* rights and asked him about the deceased. Defendant admitted that he had been with the deceased at the Pines Motel, where they had a fight, and that Schlemon was also present. En route to the police station, defendant pointed to Room 10 at the Pines Motel as the location of his fight with the deceased.

Upon questioning, defendant told the detectives that he and Schlemon had met with the deceased and Monson at the bar, and then had gone over to the raceway. Defendant also stated that after Monson went home, he went to a restaurant with the deceased, where they met Schlemon and an unknown friend of his. After eating, the four rented a room at the Pines Motel, where defendant stayed only briefly and left at 9 a.m. According to defendant, Schlemon stayed in Room 10, and that when defendant returned to the motel later in the day, Schlemon handed him the room key, which he returned to the motel operator.

Stachnik testified that after hearing defendant's version of the events, the police picked up Schlemon for questioning. Stachnik testified that he confirmed Schlemon's account that he had been with the others and that he went home after he left the raceway. Stachnik also confirmed that the following day, Schlemon slept until 11:45 a.m., at which time he had breakfast with his family. Later that day, Schlemon stated he went to a health club to meet with a

female weight-lifting partner, and that he spent the rest of the afternoon and evening at work. Stachnik testified that after he verified Schlemon's account with his family, weight lifting partner and employer, he was released.

After advising defendant that Schlemon's alibi was confirmed, the police showed him a photograph of the deceased and again gave him his *Miranda* rights. At that time, defendant began to cry and indicated that he wanted to make a full confession. According to Stachnik, defendant described how he rented Room 10 at the Pines Motel, and that he and the deceased watched television for several hours and engaged in sexual intercourse twice. After sex they began to dress, and defendant stated that the deceased "got in his face" and was "freaking out on cocaine" and speaking of revelations. Defendant stated that he hit the deceased in the face with his clenched fist, and that she fell backwards on the bed and began bleeding. Defendant continued striking the deceased in the face 10 to 15 times, and when he battered her head, it sounded like a hollow watermelon. After checking her heart and pulse, defendant realized that she was dead.

Defendant stated that he sat in the motel room and thought about this situation for about two hours. He decided to wrap the deceased's body in a yellow blanket and place it in the trunk of her car together with the linens, bedspread, pillow cases and her personal effects. He then left the motel and made five right turns before bringing the car to its final destination on a dead-end street. Defendant left the deceased's car, and took her purse, glasses and shoes and scattered them in a wooded field as he walked back towards the motel. He retrieved his motorcycle and returned to Alhquist's apartment, where he told her that he had been in a motorcycle accident and needed treatment for his bloody hands.

After the confession, the detectives and defendant returned to the Pines Motel, where he once again described the sequence of events and retraced his steps after abandoning the car. Later that evening, assistant State's Attorney James McAuliff transcribed defendant's confession, which defendant read, approved and signed.

Cynthia Barrera, a forensic scientist, testified that a swab from the deceased's vaginal region tested positive for seminal fluid. Barrera compared hair taken from the sheets, pillowcases and blankets from the motel and determined that defendant's hair was scientifically "consistent" with the hair found on the sheets and blankets. In addition, a comparison of hair found on defendant's sweat pants was determined to be "consistent" with the deceased's hair.

Barrera also performed blood-typing tests, in which she compared samples of defendant's blood with bloodstains found on sheets, pillowcases and blankets. The blood found on the yellow blanket in which the deceased was wrapped, and several of the pieces of linen, had the same ABO and haptoglobin characteristics found in defendant's blood. Barrera further testified that the bloodstains found on these items were consistent with a sample of defendant's blood and that some of the bloodstains were in the shape of a half-moon.

On appeal, defendant initially alleges that the trial court failed to properly instruct the jury as to the State's burden of proof. After first reciting the elements of murder, the court instructed the jury that: "If you find from your consideration of all of the evidence that *these propositions* have not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

Defendant asserts that according to the Illinois Pattern Jury Instructions, the judge should have advised the jury that: "If you find from your consideration of all of the evidence that *any one of* these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 7.02 (2d ed. 1981).

Defendant contends that the omission of the descriptive words "any one of" preceding the word "propositions" in the instructions given to the jury both orally and in writing misguided the jury by informing it, in effect, that to acquit defendant, it must have reasonable doubt as to *all* the elements of murder, rather than "any one of them." Defendant argues that the submission of these erroneous jury instructions constitutes grave error. Defendant cites *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, for the proposition that certain instructions, such as the burden of proof and elements of the offense, are essential to a fair trial and that the failure to give such instructions constitutes grave error when, viewing the record as a whole, it appears that the jury was not apprised of the People's burden of proof.

■■ In *People v. Layhew* (1970), 139 Ill. 2d 476, our supreme court addressed the significance of the burden of proof instruction. In that case, the trial judge failed to provide the jury with a written instruction specifically informing it that defendant was presumed innocent until proven guilty beyond a reasonable doubt. (Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981).) Citing previous decisions such as *Kentucky v. Whorton* (1979), 441

U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090, the *Layhew* court identified several factors that a reviewing court should consider in deciding whether a criminal defendant received a fair trial even in the absence of a specific written instruction to the jury on the burden of proof and presumption of innocence. Initially, the reviewing court must look at the instructions that the trial court actually did give to the jury. In this case, the record indicates that during *voir dire* the court asked each prospective juror whether he or she would sign a guilty verdict if the State proved the defendant guilty beyond a reasonable doubt. The very next question the court asked each juror was, "[i]f the defendant is not proven guilty beyond a reasonable doubt, would you sign a not guilty verdict? " Each prospective juror answered this second question affirmatively. At the close of trial, the court also informed the jury that the State had the burden of proving the guilt of defendant beyond a reasonable doubt, and that this burden remained on the State throughout the case. We also note that defense counsel failed to object to the instruction now complained of at the time it was given, nor was it raised in a motion for a new trial.

Another significant factor identified by the court in both *Whorton* and *Layhew* is whether the weight of the evidence is overwhelming. The facts in this case, as indicated by the testimony of Schlemon, Monson, Mei Wang and Reese, and the physical evidence introduced at trial (particularly the bed linens from the motel, the blood and hair sample evidence, and defendant's hand injuries for which he received treatment), combined with defendant's own confession, indicate that the State's evidence indeed was overwhelming.

We conclude, therefore, that although the jury instruction given by the trial court was inaccurate, the absence of the descriptive words in the instruction did not deprive defendant of a fair trial.

Defendant next contends that insufficient evidence existed to constitute probable cause for arrest. Initially, he argues that it was Schlemon who was romantically involved with the deceased at the beginning of the evening. More importantly, defendant maintains that Lynn Kozak, a resident of the neighborhood where the deceased's car was found, initially told the police that she saw the deceased's red Mustang parked in the street around 2:30 p.m. on Saturday, and that she saw an individual whom she described as a thin, gaunt white male wiping down the exterior of the deceased's car. Kozak observed this man for approximately 10 minutes. Defendant argues that because his physical appearance did not resemble Ko-

zak's description, and the time of her observation conflicts with the account of Wang and Reese as to when they observed the deceased's car in the motel parking lot, the police did not have sufficient evidence to constitute probable cause for defendant's arrest.

■■ We find defendant's contention to be without merit. Probable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and the person arrested has committed the offense. (*People v. Goodman* (1988), 173 Ill. App. 3d 559, 527 N.E.2d 1055.) In this case, Monson identified defendant as the last person seen with the deceased, defendant had signed a registration card at the motel, Mei Wang described defendant as the man to whom she had rented Room 10 and the deceased as the woman who entered that room with defendant, and identified two photographs of the missing bed linens found in deceased's car. Therefore, we conclude that the quantum of information known by the police officers at the time of arrest was sufficient to establish the existence of probable cause.

Defendant also argues that the trial court erred in admitting improper evidence concerning the police investigation to exculpate Schlemon after he left the group at the raceway, and we agree. Much of the detailed testimony of the officers consisted of hearsay, and even hearsay on hearsay. Similarly, the testimony of an assistant State's Attorney as to Schlemon's account of his activities was hearsay.

■■ We find, however, that defense counsel failed to raise a hearsay objection at trial during either detective's testimony or that of the assistant State's Attorney, nor was a post-trial motion filed as required by the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 116—1). The only objection raised by defense counsel was that Galinski's testimony, following Stachnik's, was repetitious. It is well established that the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124; *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E. 2d 1183; *People v. Szabo* (1986), 113 Ill. 2d 83, 497 N.E.2d 995.) An exception to the waiver rule is the plain error rule, which can be invoked in instances where the evidence is so close that there is a possibility that an innocent man may have been convicted due to an error which is obvious from the record, or the alleged error deprived the accused of a fair and impartial trial. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E. 2d 743.) As we have stated, the evidence in this case is

not close. We find that defendant was not deprived of a fair trial by the introduction of the evidence in question.

Defendant also argues that Cynthia Barrera, the forensic scientist, should not have been allowed to testify as to the hair evidence. Barrera testified that when she compared a pubic hair standard taken from defendant's body to the pubic hair in the yellow blanket found wrapped around the deceased's body, she found the hairs to be "consistent" in five separate scientific areas. Barrera further testified that a head hair found on the motel sheet, and three head hairs found on defendant's blue sweat pants and sweat jacket taken from defendant at the police station were "consistent" with samples of defendant's hair.

■ Defendant maintains that the hair evidence should have been excluded because a proper foundation was not established for its admission. However, a review of the record indicates that prior to Barrera's testimony, the trial judge conducted an in-depth *voir dire* of the witness to determine the number of scientific areas of consistency between the hair samples. Although the witness was unable to establish with mathematical certainty that the hair samples were identical, the trial judge concluded that the testimony was relevant and should be allowed.

The trial court is afforded wide latitude in determining the admissibility of expert testimony, and its decision will not be overturned on review unless clearly and prejudicially erroneous. (*People v. Huddleston* (1988), 176 Ill. App. 3d 18, 530 N.E.2d 1015, citing *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733.) In this case, we find that the trial court did not abuse its discretion in allowing this expert witness to testify that the hair samples were "consistent."

■ Defendant next argues that the trial court abused its discretion in sentencing him to an extended term of 65 years for murder. The court imposed the extended sentence on the basis that the offense was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" pursuant to section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2)).

Defendant was 24 years old. He had a previous conviction for forcible rape.

In *People v. Saldivar* (1986), 113 Ill. 2d 256, 497 N.E.2d 1138, our supreme court found that it is permissible for the trial court, in applying the statutory aggravating factors, to consider the force

employed and the physical manner in which the victim's death was brought about.

Applying the principles set forth in *Saldivar* to this case, we find that the trial court properly considered the amount and type of force employed, and the manner in which decedent's death occurred. By his own admission, defendant stated that he beat the deceased until her head sounded like a hollow watermelon. This was a brutal, savage and senseless murder. We conclude, therefore, that it was not an abuse of discretion for the trial court to have imposed an extended sentence of 65 years for defendant's reprehensible conduct.

■■ Finally, defendant claims that error occurred when the State used a peremptory challenge to exclude the only black person on the venire as a potential second alternate juror. Defendant contends that the State's conduct demonstrates purposeful racial discrimination under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 109 S. Ct. 1712.

The trial court raised the *Batson* issue *sua sponte* when it asked the prosecutors why they had challenged Lottie Thompson, the only black on the venire. The prosecutors responded that they did not know anything about Thompson's family background, and that she lived in a very high drug crime area. The prosecutor elaborated that he and his assistant just "didn't get a good feeling toward the juror" and that she did not establish eye contact with them. The trial court responded that it only partially accepted the State's explanation. Nevertheless, the court concluded that the State had not participated in any racial discrimination, since there was only one black person on the entire venire.

A trial court's determination that a defendant has failed to establish a *prima facie* case of discrimination will not be overturned unless it is against the manifest weight of the evidence. (*People v. Evans* (1988), 125 Ill. 2d 50, 63, 530 N.E.2d 1360, 1365.) Here, it is apparent that no *Batson* violation occurred in the State's peremptory challenge of only one prospective juror.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN and LaPORTA, JJ., concur.