THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL RIVERA, Defendant-Appellant.

First District (6th Division)   No. 1—00—3871

Opinion filed May 7, 2004.

GALLAGHER, J., specially concurring.
O'MARA FROSSARD, P.J., dissenting.

James K. Leven, of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary L. Boland, and Jill Gaffney-Barnum, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Following a jury trial, defendant, Michael Rivera, was found guilty of first degree murder (720 ILCS 5/9—1(a)(1) (West 1998)) and sentenced to 85 years' incarceration. Defendant timely appeals, contending (1) the trial court erred when it *sua sponte* raised a reverse-*Batson* (see *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)) challenge to his use of a peremptory challenge during jury selection, (2) his extended-term sentence violated the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and (3) his extended-term sentence violates his right to a jury trial as guaranteed by the Illinois constitution. We affirm.

## BACKGROUND

Since defendant has not raised a challenge to the sufficiency of the evidence supporting his conviction for first degree murder, we may present the case facts with tragic and clear simplicity. Defendant was a member of the "Insane Deuces" street gang and held the rank of "chief enforcer." In the early morning hours of January 10, 1998, defendant was riding in a van with several individuals who were gang members. Defendant saw the victim walking near a housing complex known as the Lathrop Homes. Defendant mistakenly believed that the victim was a "Stone," a member of a rival gang. Defendant left the van accompanied by two fellow gang members. Defendant fired several shots from a revolver. One bullet struck the victim in the back of his head and killed him. After the shooting, defendant and the two other gang members returned to the van yelling gang slogans including "Stone killer." Later, displaying the revolver to other gang members, defendant bragged that he was a "Stone killer." The police recovered the revolver from another gang member.

Defendant's first contention arises out of his attempt to use a peremptory challenge during jury selection. The challenged juror was Deloris Gomez, a business office supervisor at Cook County Hospital. During *voir dire* questioning by defense counsel, Gomez acknowledged that Cook County Hospital is known for the treatment of gunshot victims. Gomez explained that she did not work at the hospital itself but at an outpatient clinic associated with the hospital. Gomez indicated that she would not be "set off one way or another" against defendant.

Following *voir dire*, defense counsel announced his intention to use a peremptory challenge against Gomez, and the trial court called for a conference in chambers. The trial court asked defense counsel to articulate a basis for excusing Gomez. The trial court said it was acting *sua sponte* because it felt compelled to react to what it perceived as a violation of the juror's rights. Defense counsel stated that he was excusing Gomez because she worked in a hospital that probably treats more gunshot victims than any other in the world, and she probably sees the victims of violent crime on a daily basis. The parties agreed that Gomez was the second African-American woman the defense had attempted to exclude and that the defense had previously accepted one other African-American woman.

The trial court commented that, although Cook County Hospital might have the reputation of having many emergency cases, Gomez worked in a business office in a clinical division of the hospital. The trial court held that the reasons given by defense counsel did not satisfy it and ruled that Gomez would be seated over defense counsel's

objection. However, the trial court granted defense counsel's request for additional *voir dire* questioning of Gomez.

During further questioning by defense counsel, Gomez admitted that she was aware that the hospital treated a "great number" of patients who were the victims of violent crimes. Gomez again indicated that she worked in a clinical division separate from the hospital's emergency room and that the clinic was in a separate building. Gomez admitted that some of the patients being treated at the clinic were the victims of violent crime. Gomez again indicated that her experience working in a hospital that treats the victims of violent crimes did not affect her ability to be fair and follow the instructions of the trial court. Defense counsel indicated that the basis for his peremptory challenge remained the same, but added that as an additional factor he was challenging Gomez because the jury was predominantly women and he was trying to get the impact of other men on the case. Defense counsel further indicated that he had been in the clinic and that it was a disturbing place with "wall to wall" victims. The trial court again held that Gomez would be seated as a juror over defense counsel's objection.

Defendant's remaining contentions challenge the validity of his extended-term sentence. During the sentencing hearing, the trial court asked the parties to discuss the impact of the *Apprendi* decision on the State's request for the imposition of an extended-term sentence. The State argued that *Apprendi* did not apply to Illinois' murder statute because the maximum possible sentence for first degree murder was death and an extended-term sentence could not be greater than a sentence of death. The State further argued that defendant was subject to an extended-term sentence because the crime was committed in an exceptionally brutal and heinous manner and, alternatively, because defendant held a leadership position in the gang. Defendant responded that the maximum sentence for first degree murder was 60 years' incarceration and that any factor extending that term must be submitted to the jury. Defendant further argued that, even if the trial court was allowed to make the determination, the evidence did not support a finding that he acted in a brutal or heinous manner or that he held a leadership position in the gang. The trial court held that *Apprendi* did not apply because the maximum penalty for first degree murder was death. The trial court found that defendant was subject to an extended-term sentence because he was the chief enforcer of the gang and sentenced defendant to a term of 85 years' incarceration. Defendant subsequently filed a motion to reconsider his sentence incorporating his *Apprendi* arguments. The trial court denied defendant's motion.

## ANALYSIS

Defendant first contends that the trial court erred when it *sua sponte* raised a reverse-*Batson* challenge to his attempt to use a peremptory challenge against Gomez. The starting point for any discussion of the discriminatory use of peremptory challenges is the *Batson* case itself. In *Batson*, the Supreme Court held that the use of peremptory challenges by the State in a racially discriminatory manner violates an accused's right to equal protection "because it denies him the protection that a trial by jury is intended to secure." *Batson*, 476 U.S. at 86, 90 L. Ed. 2d at 80, 106 S. Ct. at 1717. However, the Supreme Court also recognized the long-established principle that racial discrimination in jury selection unconstitutionally discriminates against the excluded juror. *Batson*, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718, citing *Strauder v. West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1880). Moreover, in a passage highly relevant to the case at bar, the Supreme Court identified a broader interest, stating:

> "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice." *Batson*, 476 U.S. at 87, 90 L. Ed. 2d at 81, 106 S. Ct. at 1718.

The Supreme Court concluded that the State's use of peremptory challenges is subject to the commands of the equal protection clause, stating:

> "Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried [citations], the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89, 90 L. Ed. 2d at 82-83, 106 S. Ct. at 1719.

In response to the potential equal protection violations, the Supreme Court created the now-familiar three-step procedure used to address potentially discriminatory peremptory strikes. *Batson*, 476 U.S. at 93-98, 90 L. Ed. 2d at 85-89, 106 S. Ct. at 1721-24; see also *People v. Harris*, 206 Ill. 2d 1, 17 (2002) (outlining the three-step procedure as applied by Illinois courts). First, the defendant must make a *prima facie* showing that the prosecutor exercised peremptory challenges on the basis of race. *Harris*, 206 Ill. 2d at 17. Second, after a *prima facie* case is made, the State must articulate a race-neutral explanation for excusing the venirepersons in question. *Harris*, 206 Ill. 2d at 17. Finally, the

trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Harris*, 206 Ill. 2d at 17. The *Batson* court, however, expressly refused to rule on whether the same procedure should be applied to defense counsel's use of peremptory challenges. *Batson*, 476 U.S. at 89 n.12, 90 L. Ed. 2d at 82 n.12, 106 S. Ct. at 1719 n.12.

■ The Supreme Court addressed the question it left unanswered in *Batson* in *Georgia v. McCollum*, 505 U.S. 42, 120 L. Ed. 2d 33, 112 S. Ct. 2348 (1992). In *McCollum*, the Supreme Court was presented with a so-called "reverse-*Batson*" issue, *i.e.*, whether the limitation on peremptory challenges imposed on the State in *Batson* applies equally to criminal defendants. The Supreme Court observed that its resolution of the issue depended on the answers to the following four questions:

> "First, whether a criminal defendant's exercise of peremptory challenges in a racially discriminatory manner inflicts the harms addressed by *Batson*. Second, whether the exercise of peremptory challenges by a criminal defendant constitutes state action. Third, whether prosecutors have standing to raise this constitutional challenge. And fourth, whether the constitutional rights of a criminal defendant nonetheless preclude the extension of our precedents to this case." *McCollum*, 505 U.S. at 48, 120 L. Ed. 2d at 44, 112 S. Ct. at 2353.

The Supreme Court answered the first three questions in the affirmative and the last in the negative and concluded that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. *McCollum*, 505 U.S. at 59, 120 L. Ed. 2d at 51, 112 S. Ct. at 2359.

Defendant contends that *McCollum* does not apply to the case before us because it was the trial court, not the State, that raised the challenge to his use of a peremptory challenge. Defendant focuses his argument on the third question identified by the Supreme Court in *McCollum*. Defendant argues that although the State may have had standing to object to his use of a peremptory challenge, the trial court lacked standing and therefore lacked the power to act *sua sponte*. Defendant argues that a trial court may not address what it perceives as a discriminatory use of peremptory challenges unless the issue is raised by one of the parties. Although the State cites several cases in which it was noted that the trial court raised a *Batson* issue *sua sponte*,[1]

---

[1]See *People v. Beard*, 263 Ill. App. 3d 1077 (1993); *People v. Williams*, 252 Ill. App. 3d 704 (1993), *rev'd on other grounds*, 165 Ill. 2d 51 (1995); *People v. Harvey*, 209 Ill. App. 3d 733 (1991).

none of these cases addressed the preliminary question of whether the trial court had the right to raise the issue.

In *McCollum*, the Supreme Court followed the analysis of third-party standing that it first applied to jury selection in *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991). In *Powers*, the issue before the Court was whether a white defendant had the right to assert a *Batson* violation based on the exclusion of African-Americans from the jury. In both cases the Supreme Court used a three-part test for third-party standing. The Supreme Court held that a litigant can raise a claim on behalf of a third party, if the litigant can demonstrate that: (1) he has suffered a concrete injury; (2) he has a close relation to the third party; and (3) there exists some hindrance to the third party's ability to protect its own interests. *McCollum*, 505 U.S. at 55, 120 L. Ed. 2d at 49, 112 S. Ct. at 2357, citing *Powers*, 499 U.S. at 411, 113 L. Ed. 2d at 425, 111 S. Ct. at 1370-71. The *McCollum* Court ultimately concluded that a prosecutor acting on behalf of the State has standing to raise a *Batson* claim on behalf of the excluded jurors. *McCollum*, 505 U.S. at 56, 120 L. Ed. 2d at 49-50, 112 S. Ct. at 2357. In the case before us, we must reexamine the three-part analysis used in *McCollum* to determine whether it remains valid when the party acting on behalf of the excluded juror is the trial court rather than the prosecutor.

The first prong of the analysis considers whether the litigant has suffered a concrete injury. In *Powers*, the Supreme Court held that a defendant suffers an injury as the result of discriminatory jury selection practices because the practice casts doubt on the integrity of the judicial process. *Powers*, 499 U.S. at 411, 113 L. Ed. 2d at 425, 111 S. Ct. at 1371. The Court observed: "The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed *the court* to adhere to the law throughout the trial of the cause." (Emphasis added.) *Powers*, 499 U.S. at 412, 113 L. Ed. 2d at 426, 111 S. Ct. at 1371. The *McCollum* Court held that the State as represented by the prosecutor suffers a similar injury when the fairness and integrity of the judicial process is undermined. *McCollum*, 505 U.S. at 56, 120 L. Ed. 2d at 49, 112 S. Ct. at 2357. We believe that if the parties suffer injury as a result of actions that undermine the fairness of the judicial process, the trial judge, who presides over the trial, must suffer an equal or greater injury. In fact, when considering whether a defendant's use of peremptory challenges constitutes state action, the *McCollum* Court observed: "Regardless of who precipitated the jurors' removal, the perception and the reality in a criminal trial will be that *the court* has excused jurors based on race, an outcome that will be attributed to the State." (Emphasis added.)

*McCollum*, 505 U.S. at 53, 120 L. Ed. 2d at 47, 112 S. Ct. at 2356. If a defendant and the State, as represented by the prosecutor, are injured because racially discriminatory jury selection practices might be attributed to the State, as an act of the trial court, the clear implication is that the trial court, itself, has suffered an injury as great or greater than that suffered by the parties.

The second prong of the standing test considers whether the litigant has a close relation to the third party. In *McCollum*, the Supreme Court held that the State, acting through the prosecutor, is the representative of all the people and "the logical and proper" party to assert the rights of excluded jurors. *McCollum*, 505 U.S. at 56, 120 L. Ed. 2d at 49, 112 S. Ct. at 2357. We believe that the trial court has a similar obligation to respect the rights of anyone that comes before it whether a litigant, witness, or juror. Further, we believe that the relationship between the trial court and the jury is even closer than the relationship between the parties and the jury. The trial court and the jury are the only participants in the trial duty bound to act impartially, and the jury relies on the trial court for its instructions regarding the law. Moreover, as we noted above, the use of peremptory challenges in a discriminatory fashion is likely to be interpreted as an act of the trial court regardless of who initiates the challenge. Accordingly, we conclude that the trial court also has a sufficiently close relationship to the jurors to raise a claim of discrimination on their behalf.

The final prong of the third-party standing analysis considers the third party's ability to protect its own interests. In *Powers*, the Supreme Court described the barriers to a suit by a prospective juror as daunting. *Powers*, 499 U.S. at 414, 113 L. Ed. 2d at 427, 111 S. Ct. at 1373. In *McCollum* the Supreme Court held that the barriers identified in *Powers* were no less formidable when the discriminatory action is initiated by a criminal defendant. *McCollum*, 505 U.S. at 56, 120 L. Ed. 2d at 49-50, 112 S. Ct. at 2357. Defendant argues that the barriers identified in *Powers* and *McCollum* are not applicable in the case before us because the defendant or the State, through the prosecutor, can raise a *Batson* challenge on the juror's behalf. We find this argument unpersuasive. First, in any particular case, the jurors' rights are guarded by only one of these parties. Surely, no litigant would make a peremptory challenge and then object to its own challenge on the basis that it was discriminatory. Second, we are asked to consider the ability of the juror to assert his or her own rights. Although the State, acting through the prosecutor, may assert a *Batson* violation on a juror's behalf, if the State fails to act, a juror has no ability to require, or even request, that the prosecutor do so. Accordingly, we determine

that the barriers identified in *Powers* and *McCollum* are equally formidable in the situation presented by the case at bar. Therefore, we conclude that the trial court has standing to act on behalf of a juror subject to discriminatory jury selection practices.

■ Defendant argues that allowing a trial court to raise a *Batson* challenge *sua sponte* is improper because it places the trial court in the position of an advocate. See *People v. Bedenkop*, 252 Ill. App. 3d 419 (1993). We disagree. A trial court should not abandon its impartial role and assume the position of prosecutor. However, we do not find that the trial court does so when it raises a reverse-*Batson* challenge. When the trial court does so, it is acting on behalf of the excluded juror and is protecting the integrity of the judicial system itself. As long as the trial court responds equally to discriminatory jury selection practices whether committed by the defendant or the State, it has not violated its obligation to act fairly and impartially. Moreover, we believe that there is less danger of the trial court abandoning its impartial role because in Illinois trial courts have traditionally taken a far greater role during jury selection than during the other phases of a trial. See 177 Ill. 2d R. 234 (requiring the trial court to conduct *voir dire* questioning of jurors and acquaint prospective jurors with the general duties and responsibilities of jurors).

Although defendant argues that our opinion likely will be misconstrued, we find that the path upon which we embark today is not as slippery as defendant warns. However, for the benefit of those reading this opinion in the future, we feel compelled to state that, although a trial court has a *right* to raise *Batson* objections *sua sponte*, there is no corresponding *duty* to do so, and a defendant who fails to timely object to a prosecutor's challenges *cannot avoid waiver* by arguing that the trial court had a *duty* to question the prosecutor's motives. This is precisely the formulation adopted by our supreme court when it held that a trial court has the *discretion* to remove a juror for cause *sua sponte* but that it has no *duty* to do so. See *People v. Metcalfe*, 202 Ill. 2d 544, 557 (2002). We conclude that the trial court could properly raise the reverse-*Batson* challenge to defendant's use of peremptory challenge against juror Gomez.

■ As to the substance of defendant's reverse-*Batson* contention, defendant argues that the trial court erred when it required defense counsel to articulate a reason for his peremptory challenge because a *prima facie* case of discrimination had not been established. The trial court stated that it was raising the *Batson* issue because Gomez was the second African-American woman peremptorily challenged by defendant. Defendant argues *inter alia* that combined race-gender discrimination cannot form the basis for a *prima facie* case of

discrimination. See *People v. Washington*, 257 Ill. App. 3d 26, 34 (1993). However, we need not consider whether combined race-gender discrimination can be used to establish a *prima facie* case under *Batson*. Our supreme court has clearly held that once the trial court rules on the ultimate question of discrimination, the question of whether a *prima facie* case had been established is moot. *People v. Hudson*, 157 Ill. 2d 401, 427-28 (1993).

The dissent accuses the trial court of collapsing the three-step *Batson* procedure and argues that this matter should be remanded for a hearing on whether a *prima facie* case existed. We disagree. Although we rely on *Hudson* in reaching the determination that the issue of whether a *prima facie* case was established was moot, the dissent responds by attempting to distinguish *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991). We are aware that in *Hernandez* the Supreme Court based its holding on the fact that the State responded to a *Batson* challenge without prompting from the trial court, while in the case before us the trial court requested that defendant present a race-neutral basis for his peremptory challenge. However, by limiting its analysis to the *Hernandez* case, the dissent ignores more than a decade of Illinois case law that has considered and rejected the analysis the dissent now applies.

In *Hudson*, our supreme court considered the State's argument that the existence of a *prima facie Batson* violation was not moot because it had responded with a race-neutral reason only in response to the trial court's prompting. See *Hudson*, 157 Ill. 2d at 427. The *Hudson* court rejected the argument and considered only the propriety of the trial court's ultimate finding regarding intentional discrimination. *Hudson*, 157 Ill. 2d at 427-28. More recently this court has applied the *Hudson* decision holding, in clear language, "in a case involving a reverse-*Batson* claim by the State, the question of whether the State has sufficiently demonstrated a *prima facie* case becomes moot once the trial court rules on the ultimate issue of discrimination irrespective of whether the defendant volunteers explanations for his challenges or is prompted by the court to do so." *People v. Rivera*, 307 Ill. App. 3d 821, 830 (1999). Our research has revealed dozens of cases following the *Hudson* analysis. See, *e.g.*, *People v. Haggard*, 332 Ill. App. 3d 46 (2002). However, we see no point in cluttering the text of this opinion or burdening the reader with a lengthy string citation that would add little to our analysis. On the other hand, our research has discovered only one published case, decided after *Hudson*, that interpreted *Hernandez* as the dissent proposes and considered whether a *prima facie* showing of discrimination was made after the trial court ruled on the ultimate issue of purposeful discrimination. See *People v.*

*Washington,* 272 Ill. App. 3d 913, 916 n.1 (1995). However, we consider this case an aberration because, like the dissent, the *Washington* court looked solely to *Hernandez* and failed to address the holding of *Hudson.* Therefore, we continue to hold, like the great majority of Illinois courts, that any issue related to the first stage of the *Batson* analysis was moot.

Moreover, we observe, as a practical matter, that because the trial court's determination is based on its own observations, the first stage of the *Batson* inquiry will necessarily collapse. If a trial court observes an apparent *Batson* violation, we believe that it may proceed immediately to the second stage of the inquiry. Unlike the dissent, we would not impose on trial courts the obligation of engaging in a meaningless rhetorical exercise in which they would first articulate the basis for the perceived *Batson* violation and then announce that they have been persuaded by their own arguments. Of course, we do not intend to imply that a trial court cannot, in the exercise of its discretion, state the basis of its findings for the record or that, in a close case, the trial court is precluded from requesting that the parties present arguments regarding the existence of a *prima facie* case. However, we do not believe that the trial court is under any obligation to adopt either approach. Admittedly, allowing a trial court to *sua sponte* raise a *Batson* issue creates the potential for abuse. However, we are confident that the trial courts in this state will exercise their discretion responsibly. Unlike the dissent, we do not believe that mindless adherence to the three-step analysis of *Batson* is necessary to ensure that they do so.

■ We turn then to the question of whether the trial court erred when it determined that defendant's use of a peremptory challenge constituted purposeful discrimination. The trial court's determination as to discriminatory intent is a finding of fact entitled to great deference, and we will disturb that determination on review only if it is clearly erroneous. See *Harris,* 206 Ill. 2d at 17.

Defense counsel indicated that he used a peremptory challenge against Gomez because she worked at Cook County Hospital and he believed that her experience with gunshot victims would prejudice her against defendant. The trial court was called upon to weigh the credibility of defense counsel's explanation. In this case, the victim was African-American, and the victim's mother, an African-American woman, was expected to testify. Defense counsel's use of peremptory challenges against female African-American jurors raises the inference that defense counsel was motivated by the constitutionally impermissible belief that African-American women on the jury would react sympathetically to testimony from the victim's African-American

mother. Accordingly, the trial court could rationally find a motive to discriminate against African-Americans, women, or both groups simultaneously. The validity of the proffered explanation was significantly weakened because Gomez testified that she works in a business office at the hospital and in a building physically separated from the emergency department where gunshot victims are admitted to the hospital. The credibility of defense counsel's explanation was further weakened when defense counsel admitted that he was striking Gomez because she was a woman, even though defense counsel described this clear act of gender discrimination as an attempt to "balance" the jury. Therefore, we conclude that the trial court's determination that defense counsel was engaged in purposeful discrimination was not manifestly erroneous, and the trial court did not err when it seated Gomez as a juror over defendant's objection.

■ Defendant next contends that the imposition of an extended-term sentence violated the rule announced in *Apprendi*. The trial court based the imposition of an extended-term sentence on its finding that defendant was a leader of an organized gang pursuant to sections 5—8—2 and 5—5—3.2(b)(8) of the Unified Code of Corrections (730 ILCS 5/5—8—2, 5—5—3.2(b)(8) (West 1998)). Section 5—5—3.2(b)(8) authorizes an extended-term sentence:

"When a defendant is convicted of a felony other than conspiracy and the court finds that the felony was committed under an agreement with 2 or more other persons to commit that offense and the defendant, with respect to the other individuals, occupied a position of organizer, supervisor, financier, or any other position of management or leadership, and the court further finds that the felony committed was related to or in furtherance of the criminal activities of an organized gang or was motivated by the defendant's leadership in an organized gang[.]" 730 ILCS 5/5—5—3.2(b)(8) (West 1998).

The trial court found that defendant was the "chief enforcer" of the gang and that he was eligible for an extended-term sentence under section 5—5—3.2(b)(8). Defendant argues that this finding by the trial court violated his right to have the jury determine facts that could increase the maximum penalty to which he was subject.

The rule announced in *Apprendi* can be summarized in a simple statement: "[D]ue process requires that all facts necessary to establish the statutory sentencing range within which the defendant's sentence falls must be proven to a jury beyond a reasonable doubt." *People v. Swift*, 202 Ill. 2d 378, 383 (2002). At the trial level, and in its brief on appeal, the State argued that defendant's extended-term sentence did not violate the *Apprendi* rule because the maximum penalty for

murder in Illinois is death. However, after the State filed its brief in this case, our supreme court resolved the issue and held that the sentencing range for first degree murder in Illinois is 20 to 60 years' imprisonment and that, in order to comply with *Apprendi*, any factual findings which take a sentence beyond that range must be proven to a jury beyond a reasonable doubt. *Swift*, 202 Ill. 2d at 392. At oral argument, the State abandoned its argument regarding the sentencing range for first degree murder and focused its arguments instead on whether the *Apprendi* error in this case constituted harmless error.

In accordance with *Swift*, we find that the sentencing range for murder in Illinois is 20 to 60 years. See *Swift*, 202 Ill. 2d at 392. Accordingly, the failure to submit to the jury the question of whether defendant held a leadership position in an organized gang within the meaning of section 5—5—3.2(b)(8) violated the rule announced in *Apprendi*. See *Swift*, 202 Ill. 2d at 392. Therefore, the question before us is whether this *Apprendi* violation constituted reversible error. In *People v. Thurow*, 203 Ill. 2d 352 (2003), our supreme court recently emphasized that an *Apprendi* violation is not *per se* a reversible error and that an *Apprendi* violation may be subject to a plain-error or harmless-error analysis. *Thurow*, 203 Ill. 2d at 363.

Although the plain-error and harmless-error analyses are similar, they differ significantly in their imposition of the burden of persuasion. *Thurow*, 203 Ill. 2d at 363. The harmless-error analysis applies when a defendant has made a timely objection, and the State bears the burden of persuasion with respect to prejudice. *Thurow*, 203 Ill. 2d at 363. "In other words, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Thurow*, 203 Ill. 2d at 363. The plain-error analysis applies when a defendant fails to make a timely objection, and the defendant bears the burden of persuasion with respect to prejudice. *Thurow*, 203 Ill. 2d at 363. In other words, a reviewing court may not correct an error that would otherwise be forfeited unless the defendant can demonstrate prejudice as a result of the error. *Thurow*, 203 Ill. 2d at 363.

In the case before us, defendant raised the *Apprendi* issue at the trial level. Accordingly, we will review the State's arguments against the harmless-error standard. We believe that there can be little doubt that the State proved most of the elements of section 5—5—3.2(b)(8). The crime was clearly gang related. The crime also clearly involved an agreement between defendant and two or more other persons. The two gang members that accompanied defendant when he left the van were certainly part of the agreement, and the agreement may also have included the gang members who helped defendant obtain the weapon or hid the weapon after the crime. We believe the key question

is whether defendant occupied a position of management or leadership.

The State presented uncontested evidence that defendant was the "chief enforcer" of the gang. We believe that, in conjunction with the evidence of defendant's conduct during the shooting, no rational jury could find that "chief enforcer" was not a position of management or leadership within the gang. See *Thurow*, 203 Ill. 2d at 369. Although the State did not elicit testimony detailing the full organizational structure of the gang, it did present evidence that the "soldiers" in the gang were required to follow orders and could be "violated" if they failed to do so. The State presented additional evidence that defendant held a title in the gang and gave orders to the soldiers that were with him. We may not have evidence of the relationship between a "chief enforcer" and other gang leaders, but the State presented uncontested and overwhelming evidence that defendants position as chief enforcer placed him in a leadership position somewhere above the soldiers in the gang. Therefore, we conclude that the *Apprendi* violation in this case constituted harmless error.

Defendant finally contends that the imposition of an extended-term sentence in this case violated his right to a jury trial as guaranteed by the Illinois Constitution. Defendant argues that this right is broader than that guaranteed by the federal constitution and, unlike an *Apprendi* violation, such a violation is not subject to a harmless-error analysis. The harmless-error analysis used in *Thurow* was based on United States Supreme Court precedent interpreting the right to a jury trial guaranteed by the federal constitution. We have carefully considered defendant's arguments and recognize that, if we find that the Illinois Constitution provides greater protection than the federal constitution, we are not bound to follow the Supreme Court in lockstep. See *Thurow*, 203 Ill. 2d at 375 (Freeman, J., specially concurring). However, we find nothing in defendant's discussion of the history of criminal defendants' right to a jury trial in Illinois that compels us to break lockstep and conclude that the harmless-error analysis of *Thurow* is impermissible under the Illinois Constitution. Moreover, because we believe that a detailed discussion of defendant's Illinois Constitution argument would do little more than recapitulate the arguments already adequately set forth in *Apprendi* and its progeny, we have elected to dispose of this contention without lengthy discussion. Therefore, we conclude that any violation of the right to a jury trial guaranteed by the Illinois Constitution was harmless for the same reasons discussed above in regard to defendant's right to a jury trial under the federal constitution.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JUSTICE GALLAGHER, specially concurring:

I concur in the judgment. I also concur with regard to the trial court's raising of the *Batson* issue *sua sponte*. While I agree with the dissent that the three-step process articulated in *Batson* should be followed, I believe that occurred here. Although the trial court did not expressly state so, it is inferable that the court believed that a *prima facie* case was established when defense counsel excluded a second African-American. While it is arguable that the excusal did not constitute a pattern of strikes against African-Americans, since defense counsel also excused a white male and a white female, *Batson* requires that the relevant circumstances raise an *inference* of purposeful discrimination. To the trial court, such an inference was raised. Whether one agrees or disagrees is not the point. The point is that step one of the *Batson* process was followed.

The trial court rightfully rejected defense counsel's articulated reason that Mrs. Gomez worked at Cook County Hospital and thus would be in a position to observe gunshot victims. Mrs. Gomez made it clear that she worked in the business office of a clinic affiliated with the hospital but which was located in a separate building. After additional *voir dire*, defense counsel sought to excuse Mrs. Gomez because counsel wanted fewer women on the jury, and the court also was correct in rejecting that reason. In my view, although this was a novel presentation of the issue, the integrity of the *Batson* three-step process was preserved, and therefore, I concur in the judgment.

PRESIDING JUSTICE O'MARA FROSSARD, dissenting:

I agree with the majority's conclusion that the trial court has the power to *sua sponte* raise a reverse-*Batson* challenge when it is necessary to prevent discrimination. *Batson* and its progeny recognize that potential jurors, as well as litigants, have an equal protection right to jury selection procedures free from discrimination. It is within the discretion of the trial courts to manage and control the administration of justice, including intervening to protect this equal protection right of potential jurors, as well as litigants, by *sua sponte* raising a *Batson* challenge. See *People v. Beard*, 263 Ill. App. 3d 1077, 1081 (1993) (where trial court raised *Batson* question *sua sponte*, defendant was not obligated to have raised the issue); *People v. Williams*, 252 Ill.

App. 3d 704, 712-13 (1993) (trial court may *sua sponte* call *Batson* hearing), *rev'd on other grounds,* 165 Ill. 2d 51 (1995) (affirming trial court); *People v. Harvey,* 209 Ill. App. 3d 733, 743 (1991) (noting that the trial court raised the *Batson* issue *sua sponte*); *People v. Whaley,* 184 Ill. App. 3d 459, 470 (1989) (Rizzi, J., specially concurring), quoting *People v. Andrews,* 172 Ill. App. 3d 394, 402 (1988) (trial court " 'cannot sit idly by' " and become accomplice to discrimination in jury selection). The exclusion of even one minority person from the jury venire based on race is unconstitutional. *People v. Andrews,* 155 Ill. 2d 286, 294 (1993). Moreover, *Batson* does not require a complete exclusion of a racial group to prove discrimination. *People v. Johnson,* 159 Ill. App. 3d 991, 996 (1987).

When, however, as in the instant case, the trial court *sua sponte* raises a reverse-*Batson* challenge, the court should adhere to the three-step process articulated in *Batson.* That process was not followed here. In *Batson,* the United States Supreme Court set forth a three-step analysis for establishing whether the State exercised its peremptory challenges in a racially discriminatory manner. *Batson,* 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723. That three-step analysis is equally applicable to a reverse-*Batson* challenge raised *sua sponte* by a trial court. First, a *prima facie* case of purposeful discrimination in jury selection must be demonstrated; second, if a *prima facie* case is demonstrated, the burden shifts to the party challenging the juror to articulate a race-neutral reason for challenging the juror; and third, the trial court considers those reasons and decides whether purposeful discrimination has been demonstrated. See *Batson,* 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24. Contrary to the three-step analysis provided by the United States Supreme Court in *Batson,* the trial court, in the instant case, collapsed what ought to be a three-step procedure into an undifferentiated review of the jury selection process. See *People v. Crockett,* 314 Ill. App. 3d 389, 397 (2000).

Regarding the *prima facie* case, which is the first stage of the three-step procedure under *Batson,* our supreme court has recognized several relevant circumstances to be examined in determining whether a *prima facie* case of discriminatory jury selection has been established, including the following: (1) racial identity between defendant and the excused venire persons; (2) a pattern of strikes against African-American persons; (3) a disproportionate use of peremptory challenges against African-American persons; (4) the level of African-Americans represented in the venire as compared to the jury; (5) counsel's questions and statements during *voir dire* and while exercising peremptory challenges; (6) whether the excluded African-American venire persons were a heterogeneous group sharing race as their only common

characteristic; and (7) the race of the defendant, victim, and witnesses. *People v. Williams*, 173 Ill. 2d 48, 71 (1996). In the instant case, the record fails to reflect that the trial court examined these relevant circumstances.

The trial court did not articulate any evidence that defense counsel had engaged in purposeful discrimination, other than the fact that Mrs. Gomez would have been the second African-American female excused by the defense. Defense counsel had accepted one African-American female, Elma Starks, had excused another woman, Rosalee Huizanga, and had excused a white male, Thomas Hickey. The critical element of a *prima facie* case has been recognized to be whether the fact of removal and any other relevant circumstances raise an inference of purposeful discrimination. See *People v. Williams*, 147 Ill. 2d 173, 220 (1991). The trial court completely eliminated step one and failed to make a record demonstrating a *prima facie* case of purposeful discrimination in jury selection. In *People v. Davis*, 345 Ill. App. 3d 901, 911 (2004), the same trial judge improperly collapsed step one and step three of the *Batson* analysis.

The State relies on *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991), in support of the argument that the question of whether a *prime facie* case under *Batson* was established is moot because the defense counsel in the instant case submitted an explanation for his exercise of peremptory challenges. Based on that argument, the State contends that it is unnecessary for us to determine whether the existence of a *prima facie* case of discrimination has been demonstrated. *Hernandez* is distinguishable. Unlike *Hernandez*, in the instant case, the trial judge *sua sponte* raised a reverse-*Batson* challenge. As noted in *Hernandez*, the *prima facie* case analysis is rendered moot when a neutral reason is offered "without any prompting or inquiry from the trial court." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405, 111 S. Ct. at 1866. In the instant case, explanations were offered by defense counsel in response to the trial court's direct inquiry. After the trial court *sua sponte* raised the reverse-*Batson* challenge, the trial court questioned defense counsel's decision to excuse Mrs. Gomez by asking, "Counsel, would you kindly articulate a basis of why you are excusing Mrs. Gomez?" Defense counsel's explanations were offered in direct response to the trial court's question.

The Illinois Supreme Court in *People v. Hudson*, 157 Ill. 2d 401, 427-28 (1993), extended the ruling in *Hernandez* and held that the *prima facie* issue is rendered moot once the trial court rules on the legitimacy of counsel's explanations regardless of whether the State had or had not been prompted by the trial court to proffer its reasons.

The majority relies on *Hudson* for the proposition that where race-neutral reasons are given for the peremptory challenge, even if prompted by the trial court, the *prima facie* issue is rendered moot. *Hudson*, 157 Ill. 2d at 427-28. The majority asserts that only one published case decided after *Hudson* has held that where the trial court prompts the giving of race-neutral reasons, the issue of a *prima facie* showing is not rendered moot. See *People v. Washington*, 272 Ill. App. 3d 913, 916 n.1 (1995). However, *Hudson* is not determinative in the factual context of this case, where a trial judge *sua sponte* raised a reverse-*Batson* violation and bypassed any determination of a *prima facie* case by requesting race-neutral explanations from defense counsel for his peremptory challenge.

Neither *Hudson* nor any of the cases following *Hudson* have addressed the issue of whether trial court prompting or inquiry resulting in counsel giving explanations for the use of peremptory challenges renders the existence of a *prima facie* case moot in the context of a reverse-*Batson* challenge made *sua sponte* by the trial judge. The majority relies on *People v. Rivera*, 307 Ill. App. 3d 821, 830 (1999), as an example of a recent reverse-*Batson* case applying the *Hudson* ruling that the existence of a *prima facie* case becomes moot once explanations are given regardless of whether defendant volunteers explanations or is prompted by trial court inquiry. However, *Rivera* did not address the *prima facie* issue in the context of a reverse-*Batson* challenge made *sua sponte* by the trial judge. In *Rivera*, the State, not the trial court, raised the reverse-*Batson* challenge.

The trial court, by *sua sponte* raising the reverse-*Batson* challenge and then requesting explanations from defense counsel for his peremptory challenge, bypassed the *prima facie* issue and deprived defense counsel of an opportunity to offer input regarding the *prima facie* case. That process precluded defense counsel from challenging the existence of a *prima facie* case of purposeful racial discrimination. In the context of the instant case, a factual record demonstrating the existence of a *prima facie* case of discrimination is of particular importance to enable the reviewing court to determine whether the court's decision to *sua sponte* raise and declare a reverse-*Batson* violation was justified. Reverse-*Batson* violations are rare, and even more unusual is the fact that the alleged reverse-*Batson* violation was raised not by a party, but by the trial judge, *sua sponte*. My research has revealed no Illinois case where a trial court raised *sua sponte* a reverse-*Batson* challenge. The trial judge's failure to make a record of the *prima facie* case regarding this uncommon *sua sponte* reverse-*Batson* challenge makes proper review of the *Batson* ruling impossible.

The majority fails to address defendant's argument that *Batson* is

not applicable to combined race-gender discrimination. When the trial judge *sua sponte* raised the reverse-*Batson* challenge, the judge expressed concern about the fact that Mrs. Gomez was "the second African-American female that the defense has sought to exclude." Relying on *Hudson*'s conclusion that establishing a *prima facie* case becomes moot once the trial court rules on the ultimate issue of discrimination, the majority dismisses the defendant's argument that *Batson* is not applicable to combined race-gender discrimination. However, *Hudson* never addressed whether *Batson* is applicable to combined race-gender discrimination. The Illinois Supreme Court has held that the focus of *Batson* is on the exclusion of members of a single identifiable group, not of different groups considered together. *People v. Harris*, 164 Ill. 2d 322, 344 (1994). However, the Illinois Supreme Court has not specifically addressed the question of whether *Batson* is applicable to combined race-gender discrimination. In *People v. Washington*, 257 Ill. App. 3d 26, 34 (1993), the appellate court upheld the trial court's ruling that the defendant, who had asserted that certain jurors were stricken by the State because they were "black males," had failed to make the requisite *prima facie* showing, and stated it did not believe *Batson* applied to alleged combined race-gender discrimination. In *Rivera*, a case relied upon by the majority, the court, in addressing the issue of combined "race-gender" discrimination, claims that "this court has previously found such challenges impermissible under *Batson*." *Rivera*, 307 Ill. App. 3d at 829.

In the instant case, the trial court's failure to articulate the circumstances that demonstrate a *prima facie* case of purposeful discrimination leaves unanswered the question of whether the court's finding a *Batson* violation was based on combined race-gender discrimination. The trial judge, by collapsing the *Batson* stages and failing to make findings of fact to clarify the record regarding the relevant circumstances demonstrating a *prima facie* case of purposeful discrimination, has made proper review of this race-gender issue impossible.

For the trial court to *sua sponte* raise and resolve a reverse-*Batson* claim requires adherence to the three-step process articulated in *Batson* together with the following: (1) balancing the trial court's discretion to manage and control proceedings before it and to supervise *voir dire*; (2) demonstrating impartiality by not assuming an adversarial role; (3) recognizing the role of the peremptory challenge in the jury selection process; and (4) guarding the equal protection right of potential jurors, as well as litigants, to jury selection free from discrimination.

While the trial court properly raised the reverse-*Batson* challenge,

the trial court failed to follow the three-step process articulated in *Batson* in resolving that challenge. Step one of the *Batson* process, a *prima facie* case of purposeful discrimination in jury selection, was not addressed by the trial judge. The trial judge, by raising the reverse-*Batson* challenge *sua sponte* without making a record of the *prima facie* case of discrimination, eliminated examination of the circumstances demonstrating a *prima facie* case of purposeful discrimination. The *sua sponte* reverse-*Batson* challenge followed by the trial judge requesting defense counsel to provide explanations for using his peremptory challenge precluded defense counsel from challenging the existence of a *prima facie* case. Defense counsel had no opportunity to challenge the existence of a *prima facie* case because the trial judge had bypassed that issue when he asked defense counsel for race-neutral explanations. Eliminating step one collapsed what ought to be a three-step process into an undifferentiated review of the jury selection process.

In the context of the reverse-*Batson* challenge raised *sua sponte* by the trial judge, mindful, not mindless, adherence to the three-step *Batson* analysis is necessary to allow defense counsel the opportunity to challenge the existence of a *prima facie* case. A mindful, not mindless, adherence to the three-step *Batson* analysis is necessary to provide the reviewing court a fully developed record to determine whether the circumstances articulated by the Illinois Supreme Court in *Williams* demonstrate the existence of a *prima facie* case. A mindful, not mindless, adherence to the three-step *Batson* analysis is necessary to determine whether the court's finding of a *Batson* violation was based on combined race-gender discrimination, and if so, to determine whether *Batson* applies to alleged combined race-gender discrimination.

We should retain jurisdiction (*People v. Garrett*, 139 Ill. 2d 189, 194 (1990)) while remanding for a three-step *Batson* hearing on the present record and any additional record the trial court or parties decide to make for the purpose of determining the *Batson* issue. Regarding the first step of the three-part process, the trial court should examine the relevant circumstances as previously discussed in this dissent and articulated by the Illinois Supreme Court in *Williams* to determine whether defendant has engaged in a *prima facie* case of discriminatory jury selection. If a *Batson* violation is found, the trial court should further clarify whether the *Batson* violation is based on combined-race gender discrimination.